# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-02532-SCT

*CANDICE YOUNG, PERSONAL REPRESENTATIVE OF THE WRONGFUL DEATH BENEFICIARIES OF CHERIE S. HANCOCK, DECEASED*

*v.*

*DONALD C. GUILD, M.D.*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 08/24/2004 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RONALD M. KIRK |
| ATTORNEYS FOR APPELLEE: | WHITMAN B. JOHNSON, III |
| | DENICE C. WESLEY |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: DISMISSED - 04/23/2009 |
| MOTION FOR REHEARING FILED: | 12/01/2008 |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     The appellee's/cross-appellant's motion for rehearing is granted. The previous opinions are withdrawn, and these opinions are substituted therefor.

¶2.     In this wrongful death suicide case, the Court must consider several evidentiary issues and determine whether the trial court properly instructed the jury. We find that no reversible error occurred. Therefore, we affirm on the direct appeal, and we dismiss Dr. Guild's cross-appeal as moot.

FACTS

¶3.    Jim Herring, Cherie S. Hancock's divorce attorney, referred his client to Donald C. Guild, M.D., a psychiatrist, for a mental evaluation and medical treatment. Herring wanted Dr. Guild's expert opinion for a divorce proceeding that involved Hancock and her husband, George Thomas Hancock. Hancock's mental state was at issue in the proceeding.

¶4.    Dr. Guild first met with Hancock on August 7, 1999. Hancock informed Dr. Guild that during the 1990s her relationship with her husband and children had deteriorated; she had suffered a miscarriage; and she previously had shot herself in the chest in an attempt to commit suicide. Hancock visited Dr. Guild's office again on August 16, 1999. Dr. Guild began to treat Hancock on an inpatient basis at St. Dominic Hospital in Jackson, Mississippi, on August 20, 1999.

¶5.    On September 15, 1999, Dr. Guild testified at Hancock's divorce hearing. When asked the question, "[D]o you have an opinion as to what her condition would be if she is not allowed to move back into [her] house and have free reign [sic]?", Dr. Guild responded:

> I really just don't want to think about that. I don't think it will be good at all. I hope she would make it, but we have to find another place for her to live. It won't be permanent. It will be a temporary place. And for anybody else, for most other people, they could look ahead and see the fact that they're going to come out all right. But I'm afraid she can't do that. With her depression and everything, it's going to be clouded, she's going to be hopeless. I'm afraid she will take her life.

¶6.    Dr. Guild was also asked how long he thought Hancock would need to be hospitalized. Dr. Guild responded, "I think I could put her back into the house in two days. I would feel comfortable doing that. If she goes someplace else I just wouldn't estimate." Further, when

asked how life threatening it would be, in Dr. Guild's opinion, for Hancock not to be allowed to go back to her house, Dr. Guild responded:

> I can't put a figure on it. I can't put anything, but I couldn't recommend it. I'm here today because I'm very fearful there is a good chance that if she doesn't have that situation, she won't be here and the need for a divorce won't be before the court.

Dr. Guild discharged Hancock from the hospital on Friday, September 17, 1999.

¶7.     Dr. Guild formulated a discharge plan for Hancock which provided that she live with her mother and stepfather.  According to the plan, Hancock was to be "with someone at all times if possible . . . . [and] [i]f there was anything unusual . . . [her mother and step-father] were to let [Dr. Guild] know."  Hancock's parents were supposed to make sure that she took her medications and met with Dr. Guild on an outpatient basis.  Dr. Guild did not speak with Hancock's parents regarding the discharge plan, but he delegated that task to a social worker and Herring.  Hancock committed suicide on September 20, 1999, three days after her release from St. Dominic Hospital.

¶8.     As part of its investigation of Hancock's suicide, the Yazoo County Sheriff's Department discovered various suicide notes at the suicide scene and at the home of Hancock's mother.  Throughout the notes, Hancock blamed her husband for her impending suicide, and she assigned her possessions to various family members.  Hancock also left a note telling her children how much she loved them.

3

## PROCEDURAL HISTORY

¶9.    On September 14, 2001, Candice Young, individually and as personal representative of the wrongful death beneficiaries of Hancock, filed a complaint against Dr. Guild.  Young alleged that Hancock was under the care and treatment of Dr. Guild from August 6, 1999, until her death on September 20, 1999.  Young specifically alleged that Dr. Guild directly and proximately caused Hancock's death by his negligence in: (1) failing to meet his duty of care in treating Hancock; (2) failing to adequately assess and screen Hancock as a suicide risk prior to releasing her from the hospital; and (3) failing to take reasonable steps to eliminate or mitigate situational factors of which he was aware that constituted a danger to Hancock and enhanced her ability to take her own life.

¶10.    In his answer, filed on October 18, 2001, Dr. Guild admitted that he had provided treatment to Hancock prior to her death and that Hancock had taken her life by firearm on September 20, 1999.  Dr. Guild affirmatively pleaded section 85-5-7 of the Mississippi Code Annotated and the doctrine of illegality.

¶11.    During discovery, Dr. Guild's counsel repeatedly attempted to depose Herring and eventually filed a motion to compel Herring's deposition.  In her "Plaintiff's Response to Defendant's Motion to Compel," Young asserted the attorney-client privilege and the work product doctrine on behalf of the deceased Hancock.  Thereafter, the trial court denied Dr. Guild's motion to compel Herring's deposition by order filed April 5, 2004.  The order did not contain any grounds for the denial, and the transcript of the hearing could not be located.

¶12.    Dr. Guild also filed a motion for summary judgment contending that because suicide

4

was a common law criminal act, the illegality defense barred Young's claims against Dr. Guild. Further, Dr. Guild argued that because suicide is generally a superceding cause precluding liability, Young was required to show that her case qualified for the exception recognized in Mississippi, the Irresistible Impulse Doctrine. Dr. Guild averred that Young failed to show that Dr. Guild committed an intentional tort which caused an irresistible impulse in the decedent to commit suicide. Dr. Guild also argued that the suicide notes found by the Yazoo County Sheriff's Department demonstrated that Hancock understood the consequences of shooting herself; thus, her acts were volitional and not compensable.

¶13. Young responded that the defense of superceding cause is inapplicable in cases based upon the doctor/patient relationship. Young argued the jury should determine whether the suicide was foreseeable and determine the reasonableness of Dr. Guild's actions. Young asserted that there were genuine issues of material fact as to whether Dr. Guild took reasonable steps to prevent Hancock's suicide.

¶14. The trial court denied the motion for summary judgment without explanation on April 5, 2004. A jury trial occurred on August 17-19, 2004. Young called six witnesses, including Dr. Guild as an adverse witness. Young questioned Dr. Guild about whether he performed a suicide risk assessment and prepared a discharge plan.

¶15. Young also called Dr. Raymond F. Patterson to testify as a forensic psychiatry expert. Dr. Patterson testified that Dr. Guild violated the standard of care in the following respects: (1) he failed to perform a proper suicide risk assessment; (2) he discharged Hancock prematurely; (3) his discharge plan to assist Hancock's survival in the community at the time

5

of discharge was inadequate to that task; and (4) Dr. Guild's failure to speak directly with Hancock's mother and stepfather prior to her discharge violated the standard of care applicable to implementing a discharge plan.

¶16. Dr. Guild called four witnesses in his defense. Hancock's best friend, Donna Carey Pigg, identified handwritten letters sent to her by Hancock, and she also testified about Hancock's familial interactions. Dr. Guild essentially testified that his treatment of Hancock comported with the standard of care. Willie Bell Hood, a deputy clerk at the Yazoo County Sheriff's Department, testified about her fax transmission of the Hancock investigation file to Dr. Guild's counsel. Hood verified the date on the cover sheet as her own handwriting, but she could not identify the papers in the file as those she faxed or attest to the person who placed the papers in the file. Lastly, Dr. Sandra Holly testified as an expert in the field of psychiatry that Dr. Guild had met the standard of care in his treatment of Hancock.

¶17. At trial, Dr. Guild's counsel made this offer of proof regarding the testimony of Herring:

> [W]e would expect him to testify consistent with the – testify with regard to Ms. Hancock's state of mind regarding how she was being treated and the effect it had on her, with regard to her discharge situation that she wanted to be – wanted to go to her mama's home, she didn't want to stay in the hospital. He talked to Dr. Guild, and he also thought it was the right thing to do. She was not suicidal. Those would be the two main things, although we would also expect him to confirm various discussions he had with Dr. Guild that's been testified to by Dr. Guild.

¶18. After the offer of proof, the trial court excluded any testimony from Herring. Thereupon, Dr. Guild requested that the court give a negative inference instruction to the jury.

6

The court refused the instruction without comment.

¶19. The jury returned a verdict for Dr. Guild on August 24, 2004, and the trial court entered a final judgment on August 26, 2004. On November 22, 2004, the trial court denied Young's motion for a new trial. On December 17, 2004, Young appealed, and on December 29, 2004, Dr. Guild cross-appealed.

## DISCUSSION

## ON DIRECT APPEAL

¶20. Young raises the following issues on direct appeal:

I.     Whether the Trial Court Erred When It Denied Young's Proposed Instructions P-5 And P-6.

II.    Whether the Trial Court Erred in Denying Young an Apportionment Instruction.

III.   Whether It Was Reversible Error for the Trial Court To Admit into Evidence Cherie Hancock's Suicide Notes.

IV.    Whether the Cumulative Errors Of the Admission Of Inappropriate References to Privileged Information and Inadmissible Hearsay of Conversations with the Decedent Constitute Reversible Error.

**I.     Whether the Trial Court Erred When It Denied Young's Proposed Instructions P-5 and P-6.**

¶21. Young requested two jury instructions that set forth the standard of care for medical malpractice and related the standard of care to specific evidentiary facts. Instruction P-5 read:

If you find from a preponderance of the evidence in this case that:

1. Given the circumstances of Cherie S. Hancock's medical condition during the time the defendant, Donald C. Guild, saw and treated her, a minimally competent physician and psychiatrist who had available the same general

7

facilities, services, equipment and options as Donald C. Guild had during the time she was his patient would not have discharged Mrs. Hancock on September 17, 1999 from St. Dominic Hospital without performing a comprehensive suicide assessment and preparing an adequate discharge plan that included taking reasonable steps to provide a supportive environment and support system to Mrs. Hancock upon discharge; and

2. The defendant Donald C. Guild failed to comply with this standard of care in his treatment of the plaintiff; and

3. Such failure on the part of Donald C. Guild constituted a proximate cause or contributing proximate cause of the suicide death of Mrs. Hancock, then you must return a verdict for the plaintiff against the defendant, Donald C. Guild.

¶22.    Instruction P-6 read:

If you find a preponderance of the evidence in this case that:

1. Cherie S. Hancock was a patient of Dr. Donald C. Guild; and

2. While a patient of Dr. Guild, Cherie S. Hancock was suffering from a mental and physical condition; and

3. Defendant, Donald C. Guild, should have reasonably been aware of Mrs. Hancock's condition and was aware that she had previously attempted to commit suicide in 1996; and

4. That on September 15, 1999, defendant, Donald C. Guild testified in open court under oath in the presence of Cherie S. Hancock in a divorce preceding that in his opinion, if Cherie S. Hancock were not allowed to move back into the marital house that she would take her own life; and

5. That Donald C. Guild, knowing that Cherie S. Hancock, had not been allowed by the Court to return to the marital house, discharged her from St. Dominic Hospital two (2) days later on September 17, 1999 without performing a comprehensive suicide assessment or otherwise preparing an adequate discharge plan that included taking reasonable steps to provide a supportive environment and support system for Mrs. Hancock upon discharge; and

6. That Donald C. Guild failed to provide the care and attention that Cherie S. Hancock's condition reasonable [sic] required and which a reasonable [sic]

8

prudent and minimally competent psychiatrist treating Mrs. Hancock would have provided; and

7. That Donald C. Guild's failure to provide such care and attention was the proximate cause or a proximate contributing cause of Cherie S. Hancock's self-inflicted death by firearms on September 20, 1999, then your verdict should be for plaintiff.

The trial court denied instructions P-5 and P-6, finding that they improperly instructed the jury on what the standard of care required, when that decision was for the jury. Instead of P-5 or P-6, the trial court granted the following two medical negligence instructions:

[(1)] The Court instructs the jury that the word "negligence" as used in these instructions with regard to Dr. Guild's actions means the doing of some act which a reasonably prudent, minimally competent psychiatrist treating a patient such as Ms. Hancock would not have done under the same or similar circumstances, or the failure to do some act which a reasonably prudent, minimally competent psychiatrist treating a patient such as Ms. Hancock would have done under the same or similar circumstances. Therefore, if you believe that, during his care and treatment of Ms. Hancock, Dr. Guild acted as a reasonably prudent, minimally competent psychiatrist would have acted when faced with the same or similar circumstances, it is your duty to return a verdict for the defendant, Dr. Guild.

If you believe that, during his care and treatment of Ms. Hancock, Dr. Guild failed to act as a reasonably prudent, minimally competent psychiatrist would have acted when faced with the same or similar circumstances, it is your duty to return a verdict for the plaintiffs.

[(2)] The Court instructs the jury that you may not return a verdict against Dr. Guild simply because Ms. Hancock committed suicide after being released from the hospital. Instead, the burden of proof is on the plaintiff to prove that the psychiatrist was guilty of negligence which caused the injury. In this case, the plaintiff must prove by a preponderance of the evidence that Dr. Guild was negligent in his treatment of Ms. Hancock and that such negligence, if any, caused her suicide. Therefore, before the plaintiff is entitled to a verdict in any amount whatsoever against Dr. Guild, she must prove by a preponderance of the evidence (1) that Dr. Guild failed to act as a reasonably prudent, minimally competent psychiatrist would have acted when faced with the same or similar circumstances, and (2) that such failure, if any, proximately caused Ms.

9

Hancock's death.

Other jury instructions set out the preponderance of the evidence standard, proximate cause, and the rules for the jury's consideration of expert testimony.

¶23. Regarding jury instructions, the trial court possesses considerable discretion. *Bickham v. Grant*, 861 So. 2d 299, 301 (Miss. 2003) (citing *Southland Enters. v. Newton County*, 838 So. 2d 286, 289 (Miss. 2003) (citing *Splain v. Hines*, 609 So. 2d 1234, 1239 (Miss. 1992)). A party is entitled to a jury instruction if it concerns a genuine issue of material fact and there is credible evidence to support the instruction. *Mariner Health Care, Inc. v. Estate of Edwards*, 964 So. 2d 1138, 1156 (Miss. 2007) (citing *DeLaughter v. Lawrence County Hosp.*, 601 So. 2d 818, 824 (Miss. 1992)). While a party is entitled to jury instructions that present his theory of the case, this entitlement is limited; the trial court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Ford v. State*, 975 So. 2d 859, 863 (Miss. 2008) (citing *Howell v. State*, 860 So. 2d 704, 745 (Miss. 2003)). "On the other hand, it would be error to grant an instruction which is likely to mislead or confuse the jury as to the principles of the law applicable to the facts in evidence." *Southland Enters.*, 838 So. 2d at 289 (citing *McCary v. Caperton*, 601 So. 2d 866, 869 (Miss. 1992)).

¶24. On appellate review of the trial court's grant or denial of a proposed jury instruction, our primary concern is that "the jury was fairly instructed and that each party's proof-grounded theory of the case was placed before it." *Splain*, 609 So. 2d at 1239 (citing *Rester v. Lott*, 566 So. 2d 1266, 1269 (Miss. 1990)). We ask whether the instruction at issue contained a correct

10

statement of law and was warranted by the evidence. ***Beverly Enters. v. Reed***, 961 So. 2d 40, 43-44 (Miss. 2007) (citing ***Hill v. Dunaway***, 487 So. 2d 807, 809 (Miss. 1986)). This Court will reverse based on the denial of an instruction upon a showing that the granted instructions, taken as a whole, do not fairly present the applicable law. ***Mariner Health Care***, 964 So. 2d at 1156 (citing ***Whitten v. Cox***, 799 So. 2d 1, 16 (Miss. 2000)). Thus, "[i]f other instructions granted adequately instruct the jury, a party may not complain of a refused instruction on appeal." ***Southland Enters.***, 838 So. 2d at 289 (citing ***Purina Mills, Inc. v. Moak***, 575 So. 2d 993, 996 (Miss. 1990)). In analyzing the aggregate jury instructions, "[d]efects in specific instructions will not mandate reversal when all of the instructions, taken as a whole fairly – although not perfectly–announce the applicable primary rules of law." ***Beverly Enters.***, 961 So. 2d at 43 (citing ***Burton v. Barnett***, 615 So. 2d 580, 583 (Miss. 1993)).

¶25. On appeal, Young argues that the trial court's refusal of instructions P-5 and P-6 constituted reversible error because the jury instructions granted by the trial court omitted Young's fact-based theory of the case and were abstract when read as a whole. This Court has held that "[i]nstructions should be tied to the specific facts of the case and when given merely in the abstract, may be grounds for error." ***McCarty v. Kellum***, 667 So. 2d 1277, 1287 (Miss. 1995) (quoting ***T. K. Stanley, Inc. v. Cason***, 614 So. 2d 942, 952 (Miss. 1992)). "The test to determine whether or not an instruction is abstract is to determine whether or not the instruction relates to facts shown by the evidence on the issues involved in the case. If an instruction merely relates a principle of law without relating it to an issue in the case, it is an abstract instruction and should not be given by the Court." ***Fred's Stores, Inc. v. M&H Drugs,***

11

***Inc.***, 725 So. 2d 902, 918 (Miss. 1998). "Abstract instructions on legal principles unrelated to facts and issues set out in the instructions are dangerous, because, although they may be correct in principle, they require legal training to properly interpret." ***Kellum***, 667 So. 2d at 1287. This Court has stated that "[o]f late where we instruct our juries that all instructions must be considered as a whole, we do not consider abstractness as much of a vice, though we still do not regard it a virtue." ***Fred's Stores***, 725 So. 2d at 918. Notably, the granting of an abstract jury instruction will be considered reversible error only if the instruction tends to confuse and mislead the jury. ***Freeze v. Taylor***, 257 So. 2d 509, 511 (Miss. 1972).

¶26.    The aforementioned legal principles establish that Young is not entitled to reversal based upon the trial court's refusal of instructions P-5 and P-6 if the granted jury instructions fairly and adequately instructed the jury on the applicable primary rules of law. Young argues that the granted jury instructions failed to meet this standard because they were abstract. Young contends that the granted instructions were abstract because, while they correctly stated the standard of care, they did not relate the standard of care to any facts alleged to be medical negligence.

¶27.    We recognize that this Court has indicated that jury instructions on medical negligence should be made applicable to the particular facts of the case. ***Kellum***, 667 So. 2d at 1288. "[T]he use of an abstract instruction without application of the specific facts of the case under consideration invites reversible error." ***Id.*** Nonetheless, "our review does not begin and end with the contested instructions." ***Id.*** The overarching principle is that this Court will not reverse based upon the denial of a jury instruction if, considering the granted jury instructions

12

as a whole, the jury was fairly and adequately instructed as to the applicable primary rules of law. *See Canadian Nat'l/Ill. Cent. R.R. v. Hall*, 953 So. 2d 1084, 1100-01 (Miss. 2007).

¶28. We find that no reversible error occurred in this case because the jury instructions, considered as a whole, fairly and adequately instructed the jury on the applicable primary rules of law. The jury instructions correctly defined the elements of medical negligence, including the standard of care applicable to Dr. Guild in his care and treatment of Hancock. *See Flight Line, Inc. v. Tanksley*, 608 So. 2d 1149, 1157 (Miss. 1992) (in reviewing allegations that jury instructions on negligence were too general, this Court stated that "we ask only that the instructions, read collectively, fairly inform the jury 'on the elements necessary to establish liability.'"). Any imperfection inherent in the failure to instruct the jury on the specific acts alleged to be negligent does not require reversal; Young's theory of the case was squarely before the jury. While perhaps the trial court could have provided the jury with more definitive instructions, there is no doubt that in this case the outcome would have been the same. Given the jury instructions that were provided and the clear contrasting theories that were hammered home by the skilled counsel of both litigants, it is clear to this Court that the jury had a firm understanding of the law as it applied to the facts in this case, and it reached a permissible verdict. This issue is without merit.

## II. Whether the Trial Court Erred in Denying Young an Apportionment Instruction.

¶29. Young argues that she was entitled to an apportionment instruction. At trial, Young orally tendered the following instruction:

13

I'm proposing to say that . . . we, the jury find for the plaintiff and assess the damages, so you may apportion those damages as follows, and list the wrongful death beneficiaries, each one of them, and let the jury say – for instance, Your Honor, he's going to argue that the house – that's the home, the fact that the husband and the minor son, the part about cutting the phone line off and getting the divorce. I've got to two wrongful death beneficiaries that weren't even living at home, had been gone for four years. Any apportionment of damages as to causation by the husband or the smallest son cannot be imputed to the other two.[1]

¶30.    Young argues that the apportionment statute, Mississippi Code Annotated section 85-5-7 (Supp. 2008), and the comparative negligence statute, Mississippi Code Annotated section 11-7-15 (Rev. 2004), direct the jury to consider all conduct that may have proximately contributed to an injury. According to Young, the trial court should have given the jury an apportionment instruction pursuant to section 85-5-7 because Dr. Guild put forth evidence that Thomas Hancock and other family members caused Hancock to commit suicide. Dr. Guild's testimony indicated several times that Hancock's family exacerbated her mental condition. He referred to notes from previous doctors suggesting that Hancock's children and particularly, her husband, had mentally and physically abused her. Dr. Guild also stated that Hancock's previous psychiatrist had instructed the family that Hancock was not to have access to any guns. Pigg's testimony included various references to negative interactions between Hancock and her family and how the divorce and those interactions had adversely affected Hancock.

¶31.    Dr. Guild asserts that Young waived the right to request an apportionment instruction

---

[1]Although the record is not clear, it appears Young wanted an apportionment instruction because she feared her individual claims would be reduced because of the alleged negligence of other heirs.

14

when Young swore in an interrogatory response that no heir-at-law had exacerbated Hancock's mental illness. Dr. Guild cites *Coho Resources, Inc. v. McCarthy*, 829 So. 2d 1, 24 (Miss. 2002), where this Court held that a failure to raise the issue of another tortfeasor during discovery barred the right to an apportionment instruction.

¶32.    In *McCarthy*, the plaintiff served an interrogatory on the defendants, requesting the identity of any parties the defendants would contend caused the accident. *Id.* The defendants did not identify any additional parties in their answer, nor did they supplement their response. *Id.* Consequently, the Court found they had waived any right they had to apportion fault to another tortfeasor. *Id.*

¶33.    The Court finds that *McCarthy* controls the outcome of this issue. Young stated in a discovery response that no heir had exacerbated Hancock's mental illness. In arguing for an apportionment instruction, Young provided no other theory as to how an heir could be held partially responsible for the suicide. Young's denial in her discovery response was binding on her; she waived her right to an apportionment instruction.

### III.    Whether It Was Reversible Error for the Trial Court To Admit into Evidence Cherie Hancock's Suicide Notes.

¶34.    The standard of review governing the admissibility of evidence is whether the trial court abused its discretion. *Bullock v. Lott*, 964 So. 2d 1119, 1132 (Miss. 2007). An erroneous evidentiary ruling alone does not warrant reversal. *Young v. City of Brookhaven*, 693 So. 2d 1355, 1358 (Miss. 1997). Rather, before reversal is warranted, the Court must determine whether the proper legal standards were applied and prejudice resulted. *Id.*

15

¶35.    Dr. Guild offered in evidence exhibit D-5, consisting of suicide notes that the sheriff's office found in Hancock's bedroom and in her mother's home.  The exhibit also contained handwritten letters which Pigg and Young attested were written by Hancock.  At trial, Young objected to the admission of the suicide notes and argued they were never authenticated.  The objection was overruled, and the suicide notes were admitted into evidence.  Young contends that the admission of the suicide notes constituted reversible error.

¶36.    Rule 901 of the Mississippi Rules of Evidence governs the authentication requirements for evidence.  *Sewell v. State*, 721 So. 2d 129, 140 (Miss. 1998).  Authentication requires evidence sufficient to support a finding that the matter in question is what its proponent claims. *Id.*; Miss. R. Evid. 901(a).  A person's handwriting may be authenticated by a lay witness who is familiar with the handwriting.  *Sewell*, 721 So. 2d at 140 (citing *Hentz v. State*, 542 So. 2d 914, 917 (Miss. 1989)).  Such an authenticated document may be used by the trier of fact in comparison with a specimen for which authenticity is in question.  Miss. R. Evid. 901(b)(3). A party need only make a prima facie showing of authenticity, not a full argument on admissibility.  *Sewell*, 721 So. 2d at 140.  "Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court.  The only requirement is that there has been substantial evidence from which they could infer that the document was authentic."  *Id.*

¶37.    The Court finds that the letters Hancock wrote to Young and her children while hospitalized were sufficiently authenticated by Young's testimony.  Likewise, during her trial testimony, Pigg sufficiently authenticated a letter Hancock wrote to her.  The trial court

16

appropriately allowed the jury to compare the letters with the unauthenticated suicide notes.

This issue is without merit.

IV. **Whether the Cumulative Errors of the Admission of Inappropriate References to Privileged Information and Inadmissible Hearsay of Conversations with the Decedent Constitute Reversible Error.**

A. *Whether Dr. Guild's Counsel Erred When He Made Comments Regarding Hancock's Divorce Attorney After Young Invoked the Attorney-Client Privilege.*

¶38. Young contends Dr. Guild's counsel inappropriately commented to the jury that they would not hear from Hancock's divorce attorney, Herring, despite Young's claim of the attorney/client privilege. Young claims that these comments were prejudicial to her, since they allowed the jury to consider that Herring's testimony would have been detrimental to Young. Dr. Guild responds that any error was cured when the trial judge instructed the jury to disregard his counsel's comment about Herring.

¶39. In *Parker v. Jones County Community Hospital*, 549 So. 2d 443, 445 (Miss. 1989), this Court ruled that certain testimony violated the Mississippi Rules of Evidence and was inadmissible. The Court then noted that the trial court sustained the objection to the testimony and instructed the jury to disregard the testimony. *Id.* We stated that "[t]he law of error and curative instructions seems to be an analog to harmless error." *Id.* "Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." *Id.* at 446 (citing *Jerry Lee's Grocery, Inc. v. Thompson*, 528 So. 2d 293, 295 (Miss. 1988)). Thus, a trial court's admonishment to the jury to disregard an improper question and answer generally is deemed sufficient to cure any taint. The Court concludes that any taint

17

that resulted from counsel's comment about the absence of Herring was cured by the court's instruction to the jury to disregard the comment. This issue is without merit.

> **B.** *Whether the Trial Court Erred in Admitting Hearsay in the Form of Conversations between Pigg and Hancock.*

¶40. Young also avers that throughout Pigg's examination, Pigg referred to conversations between herself and Hancock which were hearsay. Young further argues that these statements were irrelevant, unfairly prejudicial, confusing, and misleading. Dr. Guild notes that Young failed to identify any particular statements. Dr. Guild also argues that Young elicited hearsay statements similar to those complained of when she testified about her conversations with Hancock. Dr. Guild further argues the conversations fit within hearsay exceptions because they went to Hancock's state of mind.

¶41. Young broadly states that Pigg's testimony constituted hearsay, but failed to provide this Court with any reference to that testimony. Without support from the record, this Court is not required to rule upon the merits of Young's argument. *See **Jordan v. State***, 995 So. 2d 94, 110 (Miss. 2008) (citing Miss. R. App. P. 28(a)(6) (stating "[t]he argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied upon.")). Therefore, we need not decide this issue.

> **C.** *Whether the Trial Court Erred in Admitting Hearsay in the Form of Undocumented Conversations between Dr. Guild and Hancock.*

¶42. The third error Young raises is that Dr. Guild, during his examination, repeatedly referenced conversations between himself and Hancock. Dr. Guild claims that these

conversations contained statements made for the purpose of medical diagnosis or treatment. However, Young responds that these statements do not meet the trustworthiness requirement of Mississippi Rule of Evidence 803(4) because they were not written in Dr. Guild's medical records. Dr. Guild argues that Mississippi Rule of Evidence 803(4) contains no such requirement or limitation.

¶43. Once again, Young has not provided this Court with any direction as to the specific testimony at issue. Without support from the record, this Court is not required to rule upon the merits of Young's argument. Therefore, the Court does not decide this issue.

**ON CROSS-APPEAL**

¶44. Dr. Guild raises three issues on cross-appeal:

I. Whether the Trial Court Erred in Denying Summary Judgment Because Young Failed to Provide Evidence Sufficient for the Irresistible Impulse Doctrine.

II. Whether the Court Should Have Allowed Dr. Guild to Depose Herring.

III. Whether the Court Erred in Denying Dr. Guild's Inference Instruction.

¶45. Our affirmance of the trial court's judgment in Dr. Guild's favor obviates the necessity of adjudicating these issues. This is because "[w]here relief, other than an injunction, is sought, a case is moot so long as a judgment on the merits, if rendered, would be of no practical benefit to the plaintiff or detriment to the defendant." *Gartrell v. Gartrell*, 936 So. 2d 915, 916 (Miss. 2006)). Accordingly, we dismiss the cross-appeal as moot. *See Rosson v. McFarland*, 962 So. 2d 1279, 1289 (Miss. 2007).

¶46. **ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: DISMISSED.**

19

**CARLSON, P.J., RANDOLPH, KITCHENS AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAMAR, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, J. WALLER, C.J., NOT PARTICIPATING.**

**LAMAR, JUSTICE, DISSENTING:**

¶47. I disagree with the majority because, in my view, the given jury instructions, in toto, are abstract. The two instructions which the trial court granted, and which the majority cites with approval, are not tied to the specific facts of this case. *See* ***McCarty v. Kellum***, 667 So. 2d 1277, 1287 (Miss. 1995) ("Instructions should be tied to the specific facts of the case and when given merely in the abstract, may be grounds for error.") More importantly, none of the jury instructions granted by the trial court relate the standard of care to the facts and issues of the case. As the majority aptly notes, "[a]bstract instructions on legal principles *unrelated to facts and issues . . . are dangerous*, because, although they may be correct in principle, they require legal training to properly interpret." ***Id.*** (emphasis added).

¶48. Regardless of whether or not the trial court should have granted the plaintiff's requested instructions P-5 and/or P-6, the trial court failed to fulfill its ultimate duty to properly instruct the jury with any instruction that tied the facts and issues of the case to the law of negligence.[2] The trial court should have given Young the opportunity to place before the jury an instruction that informed the jury of the matters Young contended were at issue and necessary to prove her theory of the case. When a trial court is put on notice of a legal issue on which the jury

---

[2]A trial court is not required to instruct the jury sua sponte or give instructions in addition to those tendered by the parties. ***Harris v. State***, 861 So. 2d 1003, 1016 (Miss. 2003).

should be instructed, it is the court's ultimate duty to properly instruct the jury on that issue. See *Harper v. State*, 478 So. 2d 1017, 1022 (Miss. 1985) (holding that the trial court should modify an improper instruction or advise counsel of the deficiencies and "afford counsel a reasonable opportunity to present a new instruction").

¶49.   In my opinion, the majority resorts to rank speculation in concluding that despite the trial court's failure to tie the abstract instructions concerning negligence to the facts of this case, "there is no doubt that in this case the outcome would have been the same." (Majority opinion at ¶28).

¶50.   I would reverse the judgment and remand for a new trial since the given jury instructions were all abstract, and when read in toto, failed to present Young's theory of the case.

**DICKINSON, J., JOINS THIS OPINION.**