BARNES, J., FOR THE COURT:
¶ 1. A Perry County jury found Richard Cooley guilty of aggravated assault against Dustin Cooley[1] during a confrontation where Richard undisputedly hit Dustin in the head with the butt of a shotgun. The trial judge sentenced Richard to a term of fifteen years in the custody of the Mississippi Department of Corrections, with three years to serve and twelve years suspended, plus fines and restitution. Richard timely appeals, raising three issues: (1) the trial court erred in failing to instruct the jury on Richard's defense-of-others defense; (2) Richard's trial counsel was ineffective for failing to request such an instruction; and (3) the verdict was against *768 the overwhelming weight of the evidence. Finding no error, we affirm.
STATEMENT OF FACTS
¶ 2. This case arises out of an altercation that occurred in the parking lot of a convenience store located in Janice, Mississippi, between two unrelated families with the same last name of Cooley. The primary participants were Adam Cooley and his son Dustin, the victim; Richard, the defendant, and his son Wesley Cooley. Richard arrived on the scene to interrupt a confrontation between his unarmed son, Wesley, and Adam's armed son, Dustin. An unrelated individual, Mitchell Cooley, came upon the fight and was able to break it up. However, this was after Richard had already hit Dustin in the head with the butt of his shotgun because, according to Richard, Dustin was preparing to shoot and kill his son Wesley.
¶ 3. The animosity between the two families began following a hunting incident. Each family owned hunting and timber land in proximity to the other in Perry County, Mississippi. One of Adam's sons, Tristan, and Tristan's cousin (also named Wesley Cooley),[2] killed a deer near Richard's house. They were charged with shooting from a public road and trespassing on property where Richard and Wesley kept livestock. Tristan was not convicted, but his cousin was. The father of Wes told Wesley to let him know if there was any further trouble from his son.
¶ 4. On the night of November 15, 2014, Wesley was sitting on his front porch when he heard a truck without a muffler revving its engine on the road in front of his property. Wesley testified that it sounded like the same truck Wes was driving during the prior hunting incident. Wesley decided to follow the truck and saw it was "just easing up the road." He confirmed that it was the hunting-incident truck due to its color and several stickers on the back glass. Wesley passed the truck, and the truck turned around. Wesley testified he drove to the home of Wes to see if his parents were there, but no one appeared to be home. Wesley decided to drive to the Janice store, where Wes's mother worked.
¶ 5. Wesley was correct that Wes was driving the truck, and Tristan was a passenger. The young men were coming from their hunting camp. Tristan admitted to "downshifting" when they passed Wesley's house and claimed that Wesley's truck thereafter began to follow them, driving recklessly and trying to run them off the road. Tristan became scared because he had heard "Wesley Cooley and them wanted to whip our butts" because they were mad about the prior hunting incident. Tristan called his father Adam, who instructed him not to stop but to go to the nearby Janice store because it was a public place, and he would meet them there. Instead, Wes turned the truck around and pulled into a cornfield across the road from the store to hide.
¶ 6. Meanwhile, Adam and his son Dustin drove to the Janice store, while another of Adam's sons, Ashton, got in a truck with Adam's brother to try and find Tristan. Adam had a pistol in his truck; Dustin not only had a .22-caliber rifle in the truck but also a nine-millimeter pistol on his person. When they arrived at the store, Adam told Dustin to go hide the rifle in the abandoned building across the street in order to avoid being accused of "head-lighting *769 deer."[3]
¶ 7. Wesley arrived at the Janice store in his truck and saw Dustin cross the road with a rifle and head towards the abandoned building and some bushes. At the time, neither individual knew who the other was. Dustin, an Iraq-war vet and member of the Mississippi Army National Guard, testified that as he was walking toward the abandoned building to hide the rifle a truck pulled up behind him and shined its headlights on him. When Dustin was ten feet from Wesley's truck, Wesley stepped out of his truck and asked Dustin who he was and what he was doing. Dustin replied by asking Wesley who he was, assuming he was the individual that was chasing his brother in the truck. Dustin testified that "almost like a precise military ambush," another truck came behind him and shined its bright headlights on him. The other man-Richard-got out of his truck, held up a badge, stated he was a federal marshal, and told Dustin to drop the gun. Dustin refused, stating he had a permit to carry the gun. He testified Wesley and Richard closed in on him and were trying to grab the gun from him. Dustin would not release the gun "because [he] didn't think anything good would become of me being disarmed." Dustin testified that Richard had his own rifle; so he let go of Dustin's gun and "butt stroked me in the head with his shotgun." Dustin fell to the ground. Wesley straddled Dustin trying to take Dustin's gun away. Richard hit Dustin in the head with the gun one or two more times. Blood was running down Dustin's face. Dustin then heard a gunshot fired, which he later found out was his father trying to break up the fight. Dustin decided, in a "fight or flight decision," to try and reach for his concealed pistol, but he was lying on it and could not access it. Wesley asked what Dustin was reaching for but got off Dustin when he saw Richard and Adam fighting. During the skirmish with Wesley and Richard, Dustin testified the barrel of his own gun was always pointed upward and he never made a threatening action with his weapon. He also denied pointing a gun at anybody or putting a pistol to anyone's head.
¶ 8. During the altercation, Adam was in his truck across the road about sixty feet from Wesley and Richard. Adam testified he saw Dustin and Wesley having words, and when Richard arrived, he heard Richard tell Dustin to "drop the gun. I'm a federal marshal."[4] Adam testified that Wesley tried to grab Dustin's rifle, and as they were fighting over the gun, Richard took the butt of his gun and hit Dustin in the head with it several times, knocking him to the ground. Wesley then jumped on top of Dustin and started beating him as well.
¶ 9. Adam ran across the road toward the fight and fired a warning shot into the air. Richard turned his gun on Adam, but Adam grabbed the end of it. Richard and Adam tussled over the gun. Fortunately, Mitchell Cooley, unrelated to the parties, came upon the fight, broke it up, and collected the guns. Adam maintained that Dustin never pointed his gun at Wesley or Richard, or made any threats at any time.
¶ 10. Richard testified in his own defense, and his version of the events differed *770 from that of Dustin and Adam. He claimed to arrive at the Janice store coincidentally at the same time as the confrontation between Wesley and Dustin. He noticed his son's truck parked across the road from the store. He saw Wesley telling a "young guy" (Dustin) with a long gun to put the gun down. The gun was pointed above Wesley's head. It was his "perception" that Wesley was being threatened. Prior to that point Richard did not know what had transpired. Richard exited his truck, unarmed, as Dustin leveled the long gun "down towards Wesley." Richard told Dustin "you are not going to shoot my son. Put the gun up." Richard told Dustin he was a "retired federal officer." Wesley testified he was scared for his life, and he feared Dustin was going to shoot him. Richard then retrieved his shotgun from his truck and started walking toward Dustin while Wesley, who was unarmed, reached for the barrel and snatched the gun from Dustin, throwing it away from them. According to Richard and Wesley, Dustin pulled out a pistol from his pants and pointed it at Wesley's head, threatening to shoot him. Richard then hit Dustin with his shotgun and knocked him to the ground. Wesley got on top of Dustin, and he and Richard managed to get the pistol away from Dustin. Richard testified that he was "scared" because Dustin had a gun "stuck to" Wesley's head and he was scared he could not stop Dustin from killing Wesley.
¶ 11. Wesley's testimony corroborated Richard's testimony about the encounter. Wesley claims to have shown up at the store to confront Tristan's mother about her son's behavior, not knowing Tristan, Dustin, or Adam might be there. Wesley testified that Dustin was pointing his rifle at him "the whole time." When Dustin refused to put his gun down, Wesley grabbed the barrel, snatched it, and threw the gun to the ground. Dustin then pulled a small-caliber pistol out of his pants, but Wesley grabbed it. They went to the ground with Wesley on top of Dustin, and Richard got the pistol away from Dustin. Wesley was not aware that his father had hit Dustin with the shotgun and knocked him to the ground.
¶ 12. Deputy Jeremy McSwain of the Perry County Sheriff's department arrived on the scene and noticed that Dustin had a head injury. No other injuries were observed. Dustin was transported by ambulance to a local emergency room, where he was treated for blunt-force trauma to the head. He sustained several scalp lacerations.
ANALYSIS
I. Defense-Of-Others Jury Instruction
¶ 13. Richard claims it was reversible error that the trial court did not reform sua sponte his self-defense jury instructions to include a defense-of-others theory consistent with the trial testimony. However, Richard failed to request such an instruction or reformation at trial.
¶ 14. The trial court possesses considerable discretion regarding jury instructions. Young v. Guild , 7 So.3d 251, 259 (¶ 23) (Miss. 2009). The appellate court "reviews jury instructions 'as a whole to determine whether the jury was fully and fairly instructed according to the applicable law.' " Conner v. State , 138 So.3d 143, 149 (¶ 14) (Miss. 2014) (quoting Clark v. State , 40 So.3d 531, 544 (¶ 36) (Miss. 2010) ). "We will not find error if the instructions fairly, though not perfectly, announce the applicable rules of law." Id. "A criminal defendant is entitled to present his defense to the finder of fact." Keys v. State , 635 So.2d 845, 848 (Miss. 1994). A defense-of-others instruction "may be *771 proper when the defendant has reasonable grounds to believe certain force is necessary to prevent the danger of imminent death or bodily injury to another person." Maye v. State , 49 So.3d 1124, 1130 (¶ 11) (Miss. 2010).
¶ 15. The primary concern with jury instructions is "that each party's proof-grounded theory of the case was placed before [the jury]." Banyard v. State , 47 So.3d 676, 681 (¶ 11) (Miss. 2010) (quoting Young , 7 So.3d at 259 (¶ 24) ). Richard argues this "primary concern" was not met by the jury instructions given, because Richard's primary theory of his case was defense of others-Richard hit Dustin with the shotgun in Wesley's defense. Richard claims the evidence established this theory, yet the jury instructions only covered Richard's own self-defense. Although he had reason to fear his own safety, Richard contends his testimony and the evidence show that it was his son Wesley who faced the most imminent threat of serious bodily injury.
¶ 16. The jury received three instructions related to self-defense: Instruction S-4, making aggravated assault justifiable on the grounds of self-defense; Instruction C-6, allowing Richard to claim self-defense even if he did not avoid the danger; and Instruction D-4, stating the burden of proof is on the State to prove that Richard did not act in self-defense.
¶ 17. Mississippi case law is well established that it "does not impose upon a trial court a duty to instruct the jury sua sponte , nor is a court required to suggest instructions in addition to those which the parties tender." Ballenger v. State , 667 So.2d 1242, 1252 (Miss. 1995) (quoting Conner v. State , 632 So.2d 1239, 1254 (Miss. 1993), overruled on other grounds by Weatherspoon v. State , 732 So.2d 158 (Miss. 1999) ). However, Richard contends that the trial court does have this duty if the jury instructions offered do not conform to the evidence, citing Guster v. State , 758 So.2d 1086 (Miss. Ct. App. 2000), as authority for reversal on this issue.
¶ 18. In Guster , this Court reversed a manslaughter conviction, finding reversible error because of the trial court's failure to reform a self-defense instruction to include a defense-of-others theory. Id. at 1089-90 (¶¶17-22). The defendant, Shywon Guster, had filed assault charges numerous times against the victim, Henry Hyder, whom she had dated. Id. at 1088 (¶ 9). Hyder was placed under a restraining order, but went to Guster's home anyway and threatened her. Id. at (¶ 10). While Hyder was pushing and choking Guster, her two-year old son bit Hyder on the leg. In response, Hyder kicked the child in the chest, knocking him across the table. Fearful for her life and that of her son, Guster picked up a knife and stabbed Hyder in the back to prevent further assault on her son. Id. at 1088-89 (¶¶ 10, 19).
¶ 19. At trial, Guster offered and was granted a self-defense instruction, but on appeal, claimed the trial court should have sua sponte reformed it to raise the issue of defense-of-others consistent with the trial testimony. Id. at 1089 (¶ 18). This Court found while Guster's self-defense instruction was legally correct, it "did not conform with the evidence. It was therefore the trial court's responsibility to conform the instruction to the evidence, particularly since this was the only instruction on Guster's theory of the case." Id. at 1089-90 (¶ 21).
¶ 20. Unlike Guster , here the instructions granted on self-defense conformed to the evidence. There was conflicting evidence on who the initial aggressor was-Dustin, or Wesley and Richard-and there was also conflicting evidence on whether Richard acted in self-defense or defense of *772 Wesley. While there is testimony that Richard was defending his son from harm, there was also testimony that Richard was trying to get Dustin's shotgun away from him to protect himself. Wesley testified that Dustin did not retrieve and point his pistol at Wesley until after Wesley grabbed Dustin. Testimony that Dustin pointed his rifle and pistol at Wesley and Richard was denied by both Dustin and Adam. Just because some testimony supports an instruction on a defense-of-others theory does not require the trial court to offer it, or to reform existing self-defense instructions.
¶ 21. Here, the three instructions on self-defense were in the proper form; there was no need for them to be reformed. There is no authority which places a duty on the trial court sua sponte to instruct the jury on an alternative legal theory of defense simply because some of the evidence supports the theory.
II. Ineffective Assistance of Counsel
¶ 22. Relatedly, Richard argues that his trial counsel was ineffective for failing to reform the self-defense instructions to include defense of others.
¶ 23. The benchmark for any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington , 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The reviewing court utilizes Strickland 's two-prong test to determine if counsel was ineffective. First, the defendant must demonstrate his counsel's performance was deficient. Quinn v. State , 191 So.3d 1227, 1234 (¶ 27) (Miss. 2016). A defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Stringer v. State , 454 So.2d 468, 477 (Miss.1984) ). "Second, a defendant must show that, but for his counsel's deficient performance, there is a 'reasonable probability' that the result of the proceeding would have been different." Id. (quoting Foster v. State , 687 So.2d 1124, 1130 (Miss. 1996) ). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland , 466 U.S. at 694, 104 S.Ct. 2052. For a claim of ineffective assistance of counsel, the record is reviewed de novo. Blunt v. State , 55 So.3d 207, 210 (¶ 12) (Miss. Ct. App. 2011).
¶ 24. While post-conviction proceedings are typically the most appropriate avenue to address ineffective-assistance-of-counsel claims, review on direct appeal is permitted when the issues presented "are based on facts fully apparent from the record" and the defendant is represented by different counsel on appeal. Archer v. State , 986 So.2d 951, 955 (¶ 16) (Miss. 2008) (quoting M.R.A.P. 22(b) ). The parties agree the record is sufficient to address the claim, and Richard is represented by different counsel on appeal; therefore, we shall address the claim.
¶ 25. Richard claims defense counsel was deficient for not requesting a defense-of-others instruction, or reforming the granted self-defense instructions. Further, Richard contends that if requested, the trial court would have granted the instruction because the evidence supported it-a contention the State does not dispute. Richard claims this deficiency prejudiced his defense because there was a reasonable probability the outcome of the trial would have been different.
*773 ¶ 26. For an ineffective-assistance claim, the context of counsel's actions are carefully reviewed, and "where reasonable under the circumstances, we presume the 'decisions were sound trial strategy.' " Sea v. State , 49 So.3d 614, 617 (¶ 12) (Miss. 2010) (quoting Johnson v. State , 29 So.3d 738, 745 (¶ 20) (Miss. 2009) ). However, Richard notes that "[w]hile trial counsel is entitled to the presumption that his actions fall within the ambit of sound trial strategy, that presumption is not absolute." Herrington v. State , 102 So.3d 1241, 1246 (¶ 16) (Miss. Ct. App. 2012).
¶ 27. Richard claims the evidence established that Wesley faced a more imminent and apparent threat of serious harm from Dustin than he did, but the jury was not informed that Richard could be justified in his violent actions in his son's defense. Since the evidence supported a defense-of-others theory more than a self-defense theory, Richard argues the omission of a defense-of-others instruction could not be considered a viable trial strategy.
¶ 28. We find the second prong of Strickland was not met. While defense counsel may have been deficient for failing to offer the defense-of-others instruction, Richard fails to show how this omission might have prejudiced his case. The State cites Ford v. State , 230 So.3d 316 (Miss. Ct. App. 2017), in support of this contention. In Ford , this Court found no ineffective assistance for counsel failing to offer an alibi instruction because it was not supported by the evidence. Id. at 320-21 (¶ 13). Further, the defendant failed to show how the alleged instruction would have changed the outcome of the trial. Id.
¶ 29. Here, we have a similar situation. Although a defense-of-others instruction may have been appropriate, Richard fails to show there was a reasonable probability the instruction would have changed the outcome of the trial. Richard does not overcome the strong presumption that, under the circumstances, his defense counsel not offering this instruction was part of his trial strategy. Offering such an instruction may have detracted from his theory of self-defense, which appeared to be his primary theory. A defense-of-others theory was not strongly elicited during witness testimony by defense counsel, and it was only mentioned briefly during closing argument. We are reminded here that "there is no single, particular way to defend a client or to provide effective assistance." Reynolds v. State , 736 So.2d 500, 511 (¶ 41) (Miss. Ct. App. 1999). Moreover, a defendant has "no constitutional right to errorless counsel," only competent counsel. Parker v. State , 30 So.3d 1222, 1233 (¶ 38) (Miss. 2010). Richard did not meet his high burden of showing his trial counsel was so ineffective by the omission of a defense-of-others instruction to prejudice him by undermining confidence in the trial's outcome and warrant reversal and a new trial.
III. Weight of the Evidence
¶ 30. Richard argues that his conviction was against the overwhelming weight of the evidence, and the trial judge abused his discretion in not granting him a new trial.
¶ 31. In reviewing a challenge to the weight of the evidence, "[a] reversal is warranted only if the lower court abused its discretion in denying [the] motion." Dilworth v. State , 909 So.2d 731, 737 (¶ 20) (Miss. 2005). The verdict must be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Little v. State , 233 So.3d 288, 292 (¶ 21) (Miss. 2017). "[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict."
*774 Amiker v. Drugs For Less Inc. , 796 So.2d 942, 947 (¶ 18) (Miss. 2000). The evidence will be "weighed in the light most favorable to the verdict." Id. at 954 (¶ 44).
¶ 32. Richard claims that the evidence shows Richard and Wesley had reasonable grounds to fear Dustin would shoot them, and in light of the lack of a defense-of-others instruction, his conviction sanctions an unconscionable injustice. While it is undisputed that Dustin refused to put the rifle down and it was wrestled away from him by Wesley, there is contradictory testimony whether Dustin was threatening anybody with it. Dustin denied ever pointing the gun at Richard or Wesley, stating he was holding the barrel "upward." Wesley and Richard, however, claimed that Dustin pointed the rifle over Wesley's head, although not directly at Wesley's head. When Dustin lost his rifle, Richard claims a second threat was the pistol.
¶ 33. Yet, the jury choose to believe Dustin and Adam's version of the confrontation, not Richard and Wesley's, and it is their province to do so. It is the jury's role to assess the weight and credibility of the evidence and to resolve any conflicts in the evidence. Latiker v. State , 918 So.2d 68, 73 (¶ 12) (Miss. 2005). The jury was given three instructions on self-defense. Instruction C-6 allowed the jury to find Dustin did not have to avoid the danger of another person: he was in a place he had a right to be, with a rifle, was not the immediate aggressor, and stood his ground. The jury found that the State proved beyond a reasonable doubt that Richard did not act in self-defense; he misapprehended the situation and provoked Dustin, becoming the aggressor by attempting to disarm him. Upon realizing Dustin was not going to voluntarily surrender the rifle, Richard struck him on the head with the butt of his shotgun. The jury also could have found that Richard did not have reasonable grounds to apprehend a design on the part of Dustin to kill or do great bodily harm to him, and "reasonable grounds to apprehend that there is imminent danger of such design being accomplished" under instruction S-4. We cannot say the weight of the evidence, taken in the light most favorable to the verdict, did not support the verdict.
¶ 34. AFFIRMED.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.

All of the individuals involved in this case have the last name of Cooley but are not all related; therefore, we shall refer to individuals by their first names after their initial introduction.

To alleviate some of the confusion with the identical names, we will refer to Tristan's cousin as "Wes."

Adam testified that having a loaded rifle in your truck was "one of the biggest things" in Perry County because you can be charged with head-lighting deer. He admitted to having been previously charged with the crime, and the charge had recently been brought against Tristan in the hunting incident near Richard's house.

Richard is not a federal marshal, but a retired United States Forestry Service law-enforcement officer. He carries a commemorative retired-officer badge.