# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00977-SCT

*CARLA UTZ, INDIVIDUALLY AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES AND THE ESTATE OF PRESTON JIMMY UTZ, DECEASED*

*v.*

*RUNNING & ROLLING TRUCKING, INC. AND ANTHONY Q. HUNTER*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2008 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES ASHLEY OGDEN |
| | WENDY MICHELLE YUAN |
| ATTORNEYS FOR APPELLEES: | JASON HOOD STRONG |
| | B. STEVENS HAZARD |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 04/15/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., LAMAR AND CHANDLER, JJ.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.    This case involves a wrongful-death action against Running and Rolling Trucking, Inc. (R&R), and Anthony Q. Hunter (Hunter) for the death of Preston Jimmie Utz (Preston) On December 14, 2003, Preston was driving on Highway 61 in Bolivar County, Mississippi. Hunter, a truck driver for R&R, drove an eighteen-wheeler tractor-trailer truck on Highway

¶1. The Nissan Maxima occupied by Preston struck the rear of Hunter's tractor-trailer and killed Preston.

¶2. Following Preston's death, his widow, Carla Utz (Carla), filed a wrongful-death action against R&R and Hunter in the Circuit Court of the Second Judicial District of Bolivar County, Mississippi. A jury trial was conducted on April 7-10, 2008. The main issue at trial was whether R&R's failure to provide reflective tape, also known as conspicuity tape, as required by the Federal Motor Carrier Safety Regulations (FMCSR), caused the accident. The trial court instructed the jury that R&R and Hunter were negligent by violating the FMCSRs, therefore, the jury had only to decide the liability issue of proximate cause. The jury returned a verdict in favor of R&R and Hunter. Carla filed post-trial motions for judgment notwithstanding the verdict (JNOV), or in the alternative, a new trial, or in the alternative, additur. The trial court denied Carla's post-trial motions. Carla appealed the trial court ruling, raising forty-two issues.[1]

**FACTS**

¶3. Preston Utz, along with two friends, Ephraim Woolf and Sabrina Ashmore, spent Saturday, December 13, 2003, gathering ingredients to "cook" methamphetamine (crystal meth). They arrived at a nearby lake at approximately midnight and began the cooking process. By 4:00 a.m., the first "pull," or batch, of the drugs was ready. Preston, Woolf, and Ashmore all "tested," or smoked, the crystal meth. Between 1:00 and 2:00 p.m. Sunday afternoon, Preston, Woolf, and Ashmore left the lake and went to Steve Brooks's house

---

[1] These issues have been recombined into twenty-five issues.

2

located near Cleveland. When they arrived at Brooks's house, they divided the crystal meth among Preston, Woolf, Anderson, and Brooks. Later that evening, Preston borrowed Brooks's Nissan Maxima to drive Ashmore home to Clarksdale. On his return trip to Cleveland, Preston collided with an eighteen-wheeler tractor-trailer driven by Hunter for R&R. Preston died as a result of the collision.

## DISCUSSION

### I. Evidentiary and Procedural Issues

¶4. This Court has held that the standard of review for a trial court's decision to either admit or exclude evidence is abuse of discretion. ***Robinson Prop. Group, L.P. v. Mitchell***, 7 So. 3d 240, 243 (Miss. 2009); ***Beverly Enters., Inc. v. Reed***, 961 So. 2d 40, 44 (Miss. 2007). The appellate courts will not reverse a ruling to admit or exclude evidence unless a substantial right of a party is adversely affected. ***Mitchell***, 7 So. 3d at 243.

¶5. Mississippi Rules of Evidence 401, 402, and 403 address what evidence is relevant and when relevant evidence, nevertheless, may be excluded. Rule 401 states:

> "Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

¶6. Mississippi Rule of Evidence 402 states:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Mississippi, or by these rules. Evidence which is not relevant is not admissible.

¶7. Mississippi Rule of Evidence 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

3

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶8. The standard of review for the admission or suppression of evidence, including expert testimony, is an abuse of discretion. *Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara*, 908 So. 2d 716, 721 (Miss. 2005) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003)). *See also Investor Res. Servs., Inc. v. Cato*, 15 So. 3d 412, 416 (Miss. 2009); *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 946 (Miss. 2008).

¶9. Rule 702 of the Mississippi Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702. To determine the admissibility of expert-witness testimony, this Court adopted a test in *McLemore* as stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and as modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). *McLemore*, 863 So. 2d at 35. In *McLemore*, this Court determined that, under Rule 702, expert testimony is admissible if it is relevant and reliable. *Id*. at 38. Rule 702, however, does not provide for a relaxation of "the traditional standards for determining that the witness is indeed qualified to speak an opinion on a matter within a purported field of knowledge." Miss. R. Evid. 702 cmt. Further, the trial judge is considered the gatekeeper and determines the value of the

expert testimony. *Cato*, 15 So. 3d at 416. As the gatekeeper, the trial judge ensures that any expert testimony is relevant and reliable. *Poole*, 908 So. 2d at 723.

¶10. Relevant evidence is that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. The threshold for admissibility is not great, keeping in mind the fact that Rule 401 favors the admission of evidence when it has probative value. *Cato*, 15 So. 3d at 417 (citing *McLemore*, 863 So. 2d at 40). When determining reliability, this Court has held that the expert testimony must demonstrate that his opinion "is based upon scientific methods and procedures, not unsupported speculation." *Adcock*, 981 So. 2d at 947. To this end, this Court has enumerated some factors that may be considered as follows:

> '[W]hether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether . . . there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance' within the expert's particular field. *McLemore*, 863 So. 2d[] at 37 (citing *Daubert*, 509 U.S. at 592-94, 113 S. Ct. 2786).

*Id*. *See also Cato*, 15 So. 3d at 417.

### 1. Drug use by Preston

¶11. Carla argues that the trial court erred by denying her motion in limine to exclude testimony from Ephraim Woolf concerning Preston's alleged making, using, or selling methamphetamine (crystal meth) before the wreck. She claims that the testimony was hearsay, prejudicial, and not relevant. Further, Carla claims that the prejudicial effect was

5

compounded by the testimony of the State toxicologist, Carmen McIntire, that Preston had no crystal meth in his system at the time of the wreck.

## A. Ephraim Woolf

¶12. The trial court denied Carla's motion in limine to exclude Woolf's testimony. The trial court determined that Woolf's testimony was not hearsay, because it was his personal observation and knowledge. *See* Miss. R. Evid. 801 and 602. While the trial court acknowledged that the testimony was likely to be prejudicial, the test, pursuant to Rule 403 is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Under that test, the trial court determined that the probative value of the testimony concerning activities involving methamphetamine prior to the crash did not outweigh the danger of unfair prejudice. The trial court stated, in part:

> As concerns the claim that the prejudicial effect of such evidence would outweigh the probative value and confuse the jury as to the facts of this case, the court can quickly conclude that the evidence will most likely have a prejudicial effect upon the jury's view of the plaintiff. However, that is not the test. The test is whether under MRE 403 the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Again, there appears to be no attack as to the veracity of such evidence. The defendants assert that at the time of the accident, the deceased was coming down from a crystal methamphetamine "high," a process known as "crashing." According to at least one defense expert, when an individual crashes following a crystal methamphetamine high, such an individual would be prone to dozing off and/or not be highly reactive. Despite the plaintiff's argument to the contrary, the court finds that the probative value of evidence that the deceased engaged in activities involving methamphetamines prior to the accident is not substantially outweighed by the danger of unfair prejudice.

¶13. Woolf testified, that prior to the wreck, Preston had been staying at his house on and off. On Saturday, the day before the collision, Woolf stated that Preston was with him and a girl named Sabrina (Ashmore). The group planned to "cook" crystal meth. During the day,

6

they all helped to gather the ingredients for the crystal meth. They all met at Steve Brooks's house before going to Beulah Lake to cook the crystal meth. Woolf testified that Brooks was at his house when they arrived, and Brooks knew what they were going to do. Woolf, Preston, and Ashmore arrived at the lake around midnight, started cooking the meth about 1:00 a.m., and about three hours later, the first "pull," or batch, was ready to smoke. Woolf stated that he, Preston, and Ashmore all smoked the drugs and got high. According to Woolf, they cooked the drugs all night and into the next day until about lunchtime, that being 1:00 to 2:00 p.m. Because of the ether that is used in the process of making the drugs, Woolf stated that eventually, a crystal meth user will fall asleep. They returned to Cleveland around 6:00 p.m. and went to Brooks's house to split the drugs. Woolf, Preston, Ashmore, and Brooks all took a share of the drugs. Then, they all got high again and hung around for a while at Brooks's house. Preston drove Ashmore home to Clarksdale, leaving Brooks's house at about 10:30 or 11:00 p.m. Woolf stated that he would not have wanted to travel with Preston at that time because they had been smoking and awake for days.

¶14. The trial court did not err by admitting Woolf's testimony. Woolf testified about events that were within his personal observation and knowledge. *See* Miss. R. Evid. 601 and 602. His testimony was not hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Miss. R. Evid. 801. Woolf testified about his actions and Preston's actions prior to Preston leaving Brooks's house to bring Ashmore home and the fatal collision. Woolf did not testify to any statements made by Preston. Woolf testified only about events that were within his personal knowledge, as he was with Preston on the day

7

before and day of the accident until Preston departed from Brooks's house. Therefore, Woolf's testimony was not hearsay.

¶15. The trial court determined that the evidence was relevant and conducted a balancing test pursuant to Rule 403, finding that the probative value outweighed the prejudicial effect. The testimony was relevant because it concerned the type of activity that Preston was involved in prior to the accident and what impact that activity may have had on his alertness at the time of the accident. The evidence was relevant, and the probative value outweighed the prejudicial effect because it concerned the issue of proximate cause and potential fault.

### B. Toxicology experts Carmen McIntire and Michael Weaver

¶16. Carla also argues that the trial court erred by denying her motion in limine pertaining to evidence by R&R's expert, Michael Weaver, that Preston had methamphetamine in his blood at the time of the collision.[2] R&R asserts that this testimony supports its theory of how the accident occurred. The trial court denied Carla's motion in limine to exclude this evidence on the same basis as it denied Woolf, the probative value of evidence concerning methamphetamine in the blood of the deceased at the time of the accident was not substantially outweighed by the danger of unfair prejudice pursuant to Rule 403.

¶17. Two toxicology experts were qualified and testified concerning Preston's blood test. Carmen McIntire (McIntire), a Mississippi Crime Laboratory toxicologist, testified for Carla. Michael Weaver (Weaver), a former Mississippi Crime Lab toxicologist, testified for the defense. At issue was McIntire's report concerning Preston's blood test. She testified that

---

[2] Unless otherwise noted, R&R and Hunter will be referred to collectively as "R&R."

she had performed two tests on Preston's blood: (1) an immunoassay test, and (2) a gas chromatograph mass spectrometer test (mass spectra). Based on her analysis, McIntire stated that she had found no crystal meth in Preston's blood. Her report showed that Preston had only caffeine in his blood. However, she stated that the results of the mass spectra test had some features that were indicative of methamphetamine, but "they didn't meet criteria needed to be able to say for sure that that's what was in fact present. So I reported it negative." McIntire also testified to the effects of methamphetamine, an initial feeling of euphoria and excitability followed by feelings of depression, fatigue, anxiety, irritability, and eventual unconsciousness. She also stated that a person could have delayed perception as a result of the drug use.

¶18.   Weaver, on the other hand, testified that in his opinion, methamphetamine was present in Preston's blood. Weaver said that he based his opinion on the ions present in Preston's blood and the testimony from Woolf that Preston had smoked crystal meth. He also testified concerning the effects of methamphetamine on a person's body. His testimony on the effects of the drug was similar to that of McIntire.

¶19.   The trial court did not err by admitting Weaver's expert testimony on whether Preston had methamphetamine in his blood. Both experts were qualified, and Carla did not object to Weaver being qualified as an expert. "Once a witness is qualified as an expert to render expert testimony, then it is within the province of the trier of fact to give weight and credibility to the testimony." *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 796 (Miss. 1995). This Court has held that expert opinions are only advisory in nature and are not binding on a trier of fact. *Flight Line, Inc. v. Tanksley*, 608 So. 2d 1149, 1166

9

(Miss. 1992). "The jury may credit them or not as they appear entitled, weighing and judging the expert's opinion in the context of all of the evidence in the case and 'the jury's own general knowledge of affairs . . . .'" *Id*. (quoting *Schoppe v. Applied Chems. Div.*, 418 So. 2d 833, 837 (Miss. 1982)). Thus, the trial court did not err by admitting Weaver's testimony concerning Preston's blood, as it was relevant, it was more probative than prejudicial, and it was supported by Woolf's testimony. To the extent that Weaver's testimony differed from that of McIntire's, that was an issue of credibility to be resolved by the jury. *Flight Line,* 608 So. 2d at 1166. This issue is without merit.

### 2. Alleged drugs found in the deceased's pants

¶20. Carla next contends that the trial court erred pursuant to Rules 401, 402, and 403 by allowing Martha Fly and Rachel Foster, Preston's mother and sister, respectively, to testify about a white substance found in Preston's pants pocket two months after his death. The trial court granted Carla's motion in limine to limit the testimony of Fly as to the substance found in Preston's pocket. However, based on Foster's purported experience with crystal meth, the trial court allowed her to testify about the substance found in Preston's pocket pursuant to Rule 701.

¶21. Mississippi Rule of Evidence 701 states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of 702.

10

¶22.	At trial, Fly stated that she had received Preston's clothing from the funeral home, including his pants. She had placed them in the trunk of her car. After a number of weeks, Fly viewed the clothing and found a plastic bag with a white substance in Preston's pants pocket. She called Foster to come and look at the item. Foster testified that she was familiar with how crystal meth looked and smelled, having smoked it as a teenager. Foster testified that the substance found in Preston's pants was crystal meth. However, the substance was flushed down the toilet and was not tested.

¶23.	The trial court did not err in allowing testimony that the substance in Preston's pants was crystal meth pursuant to Rule 701. Foster stated that she was familiar with crystal meth, having smoked it as a teenager. She stated that she knew what it looked like and what it smelled like. Foster actually saw the substance that her mother found and opened the package and smelled it. The substance smelled like ammonia, as does crystal meth. Foster concluded that the substance was crystal meth.

¶24.	The testimony falls within the parameters of Rule 701, because the testimony was rationally based on the perceptions of Foster; it was helpful to the jury for a clear understanding of the testimony and the determination of a fact in issue, that being whether Preston had experienced any effects of drug use at the time of the accident; and the testimony was not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Further, Fly's and Foster's testimony corroborated Woolf's testimony to the extent that the drugs were divided at Brooks's house and placed into plastic bags. This testimony also helped refute Brooks's testimony that he did not see any drugs and no one had used drugs in his home on the day of the accident. This issue is without merit.

11

### 3. Weaver's testimony on the effects of drug use

¶25.    Carla argues that the trial court erred by allowing Weaver to testify to the effects of the use of methamphetamine on Preston's body. Specifically, Weaver testified that, based on the testimony of Woolf and the results of the mass spectra test, Preston "could have" been fatigued, experiencing delayed perception, and had a delayed reaction. Further, she argues that R&R failed to raise this issue in discovery.

¶26.    The trial court determined that it had not made a prior ruling on the issue. While the trial court acknowledged that it had limited some evidence on the issue of visibility, it had not ruled on the issue of fatigue. Carla argued that the testimony concerning fatigue or delayed perception or reaction all went to the issue of visibility. The trial court disagreed and allowed this testimony.

¶27.    As to notifying Carla of the potential testimony of Weaver, the record reflects that R&R filed a designation of expert witnesses which contained the exact testimony that R&R elicited from Weaver on the stand. Weaver also had submitted an affidavit. In his expert-witness testimony designation and affidavit, Weaver stated that, based on Preston smoking methamphetamine, his staying awake the night before the accident, and the accident occurring at a point in time when most of the drugs had been eliminated from Preston's body, Preston would have experienced fatigue and compromised perception and reaction when he operated the vehicle. Carla's contention that she had no notice of this aspect of Weaver's testimony is without merit.

¶28.    As for Carla's contention that the trial court erred by admitting Weaver's testimony concerning Preston's possible state of fatigue and delayed perception and reaction abilities

12

as impermissible under Rules 702 and 703 and Rules 401, 402, and 403, this issue is without merit. First, Carla did not object to Weaver's use of the words "could have" as being an improper legal standard pursuant to Mississippi Rules of Evidence 702 and 703. Carla did object that R&R failed to provide an expert opinion on the subject and that the trial court previously had limited testimony about what Preston would have seen on the night of the accident. As previously determined, Carla was provided notice of the contents of Weaver's expert opinion, which included the issue of fatigue. The trial court determined that it had not made a prior ruling limiting testimony on the issue of fatigue. Carla's objection was more related to a link between fatigue and visibility. Carla's counsel argued that "[Weaver's] going to talk about fatigue and he is going to say that the fatigue could have had something to do with the visibility." The trial court overruled the objection on those grounds. While Carla objected to Weaver's testimony on this issue, she did not object to Weaver testifying that Preston "could have" been fatigued as an improper legal standard. Second, Weaver did not state these opinions in relation to Preston's personal visibility at the time of the accident, as argued by Carla at trial. Third, Weaver was designated as an expert without objection. Fourth, Weaver based his opinion on the blood test performed by McIntire, another toxicologist, and the testimony of Woolf, who was with Preston on the day before and the day of the accident. Fifth, both toxicologists, McIntire and Weaver, testified concerning the initial effects of methamphetamine on a person's body and its after affects. Sixth, Woolf's and Weaver's testimony rebutted the testimony of Steve Brooks, a witness in Carla's case-in-chief. Brooks stated that Preston was a slow and careful driver. In addition, he stated that, on the day of the accident, Preston had slept at Brooks's house until midday, and no drugs

13

were used in his house. Finally, we addressed Carla's argument with regard to relevancy and probative value outweighing prejudicial effect in the previous issue. Accordingly, the trial court did not err by admitting this evidence.

### 4. Exclusion of R&R's carrier rating

¶29. Carla argues that the trial court erred by excluding evidence of R&R's carrier rating. She contends that the rating was relevant because it showed a pattern and practice of not following the FMCSRs, and it was a proximate cause of the accident. The trial court excluded the evidence, finding it too remote to have relevance to the issue involved in the litigation at hand.

¶30. Carla did not specifically identify the violations at issue. The carrier rating at issue was for violations occurring after the date of Preston's wreck, and none of the violations involved a violation for non-use of reflective tape.[3] Further, the overall carrier rating was satisfactory. Notwithstanding this, the carrier rating was not relevant under Rule 401 to the litigation that arose from Preston's death. Carla's main contention was that the tractor-trailer did not have any reflective tape on the back panel. Further, the trial court gave an instruction that stated that R&R and Hunter had violated the FMCSRs and were negligent. Therefore, the trial court did not err by excluding the carrier rating.

### 5. Exclusion of Hunter's driving record

---

[3] One violation was for improper hiring paperwork. R&R actually hired an employee prior to the accident, however, it appears that the employee never drove a truck until almost a year after the accident.

14

¶31. Carla sought to have Hunter's driving record admitted at trial. She argues that the trial court erred by excluding the driving record because his record of FMCSR violations showed a pattern and practice of violating the regulations. In his deposition testimony, Hunter admitted that he had received a violation prior to the accident. Hunter's truck was placed "out-of-service" for a leak in his fuel tank, which he immediately had fixed.

¶32. The trial court excluded the violation, finding that it was not relevant to the issue of the wrongful-death case and too remote in time to have any relevance to the case. Further, the trial court determined that the number and severity of the violations did not demonstrate a routine or practice sufficient to support Carla's arguments. We find that the trial court did not err by excluding Hunter's driving record. The trial court instructed the jury that R&R and Hunter had been negligent for violating FMCSRs. Therefore, the jury knew that R&R and Hunter had violated the regulations. As the fuel leak in question was unrelated in any manner to the accident and whether the absence of reflective tape caused the accident, the trial court properly excluded this evidence pursuant to Rules 401 and 403.

### 6. Plaintiff's expert testimony on taillights

¶33. Carla argues that the trial court erred by excluding two of her experts from testifying on the issue of the taillight visibility. She also contends that the trial court erred by allowing two of R&R's lay witnesses to render opinions on taillight visibility. The issue arose in connection with photographs that depicted what appeared to be dirt on the taillights of the R&R truck on the night of the accident. The trial court granted R&R's motion in limine on this issue, finding that an expert opinion was not necessary to determine what is depicted in a photograph. More specifically, the trial court stated:

15

> Whatever the status of the taillights on the trailer immediately following the accident, such status is depicted in the photographs taken by the Mississippi Highway Patrol. It is this court's view that it does not take an expert to advise a jury as to what is depicted in a photograph. The jury can view the photograph itself and make its own determination as what is depicted therein. Thus, the court finds that an opinion from an expert as to what is depicted in a photograph would not be of assistance to the jury.

In other words, the trial court prohibited any expert opinions that the taillights of the R&R truck had dirt on them or were dirty at the time of the accident. Carla claims that her experts, Tim Corbitt and Dane Maxwell, would have opined about the dirt on the taillights and how that dirt would have affected the visibility of the lights at night. The trial court, in fact, did not preclude Carla from asking her experts, in a hypothetical situation, about the effects of dirt on taillight visibility. The trial court stated that the expert "can talk about if, in fact, there was dirt on the taillight, what effect it would have on the visibility of the trailer. Essentially, a hypothetical."

¶34.   This Court finds that the trial court did not err by refusing all experts, both Carla's and R&R's, from testifying concerning dirt on the taillights or that the taillights were dirty. Opinions given by expert witnesses are designed to provide "scientific, technical, or other specialized knowledge" to assist the trier of fact to understand the evidence or determine a fact in issue. Miss. R. Evid. 702. This issue, dirt on the taillights, was not of a nature that required an expert opinion, as the jury had enough knowledge to discern whether the photographs depicted dirt on the taillights. Furthermore, it was established that neither Corbitt nor Maxwell was present at the scene of the accident, therefore, they had no first-hand, personal knowledge of the condition of the taillights directly after the accident to assist the trier of fact, nor did the experts inspect the trailer immediately after the accident. This

16

is not to say that the experts had to be present or to inspect the truck immediately, but only that there was no other basis to permit them to testify about the condition of the taillights in the photographs. Accordingly, this issue is without merit.

¶35. As to Carla's argument that the trial court erroneously had permitted lay witnesses for the defense to testify on the condition of the taillights, this issue is without merit. While Carla does not identify which lay witnesses are in question, presumably she means Trooper Ronald Shive and Charles Richard. Both of these witnesses were at the scene of the accident moments after the collision. Trooper Shive testified about his personal knowledge and observations of the conditions at the scene of the accident. *See* Miss. R. Evid. 601 and 602. He stated that he had no difficulty seeing the trailer, and it had four lights on it. The lights were in proper working order, were bright, and had lenses on them. Trooper Shive also stated that he could see the lights from a distance.

¶36. Richard also testified about his personal knowledge and observations. *See* Miss. R. Evid. 601 and 602. Richard stated that he had observed the truck lights working when Hunter left the R&R lot and later at the scene of the accident. Once he heard about the accident, Richard said that he began driving to the scene and saw the trailer taillights from a mile away. Richard stated that, after the accident, the tag light and three small lights on the bottom and in the middle of the trailer had to be replaced, because they were torn off in the collision. Because Trooper Shive and Richard testified concerning their first-hand, personal knowledge and observations of the accident scene, the trial court did not err by permitting them to testify concerning their observations of the visibility of the truck taillights after the accident.

17

**7. Exclusion of trailer's "out of service" status and causation**

¶37. Carla argues that the trial court erred by excluding her expert, Mark Dunlap, from testifying that the truck was "out of service" at the time of the collision due to a lack of reflective tape.[4] She argued that the lack of tape was in direct violation of the FMCSRs and, therefore, the truck should not have been on the roadway.

¶38. The trial court qualified Dunlap as an expert in State and Federal Motor Carrier Safety Codes. At trial, Carla proffered the testimony of Dunlap on the issue of whether the truck was "out of service." The proffered testimony was as follows:

> Q. Mark [Dunlap], would you tell this Court what your findings are regarding whether or not this trucking company should have been permitted to have this vehicle on the road the day of the accident?
> A. Should not have been on the road in that condition.
> Q. Why not?
> A. Did not meet the requirements for the conspicuity tape, 393.13.
> Q. Okay, and can you tell us whether or not you have an opinion regarding whether or not that truck and trailer were in service or out of service? Based on the violations for the conspicuity tape?
> A. Right. The truck –
> Q. – Scratch truck. Just the trailer?
> A. *The trailer was not out of service. However, had I come across it, I would have held it due to the fact it was a dangerous violation.*
> Q. Meaning you would not have allowed it to continue?
> A. I would not have allowed it to continue on the road.
> Q. Give us your opinion on causation in regards to the injuries as to Preston Utz?
> A. The only thing that I could comment on is the fact the truck should never have been on the road in the first place. That would be my causation.
> Q. Okay. No further questions.

---

[4] The FMCSRs states that "[a]uthorized personnel shall declare and mark "out of service" any motor vehicle which by reason of its mechanical condition or loading would likely cause an accident or breakdown." 49 C.F.R. § 396.9(c)(1).

18

(Emphasis added.)

¶39. Carla contends that the trial court erred by finding that this issue concerned strict liability. Instead, Carla contends that, once R&R and Hunter admitted that they had violated the FMCSRs, a violation of state and federal law, the trial court should have granted a peremptory instruction as to liability in lieu of the negligence-per-se instruction and should have permitted her to have expert testimony on causation with regard to the trailer being "out of service."

¶40. The trial court, in the order granting in part and denying in part R&R's motion to strike various opinions to be offered by Carla's expert witnesses, determined that all of the expert witnesses for Carla had a common theme of strict liability against R&R, based on her theory that the truck had no reflective tape and, therefore, it should not have been on the roadway. The trial court stated:

### Causation - Strict Liability

17. A common theme running through all of the opinions of the plaintiff's experts is their position that because the truck failed to have the federally required amount of reflective tape on the rear of the truck, the truck should not have been on the highway, and thus *they conclude the defendants are liable for the injuries and death of the plaintiff simply because the truck was on the roadway. By this argument, the plaintiff seeks to impose* strict liability *against the defendants.*

18. Strict liability is not pled in the complaint. Also, this court is of the opinion that this case is not one premised on strict liability. Although the violation of federal regulations alleged by the plaintiff – the failure to have reflective tape attached to the rear of the trailer – is a factor that may be considered by the jury when assessing liability, there must exist some casual connection between the alleged violation and the accident. Without such a causal connection, it is this court's view that no liability would attach to the defendants premised only upon an alleged violation of federal or state regulations.

19

19. For the reason stated above, no expert will be permitted to opine or give testimony to the effect that the subject truck should not have been on the highway due to its alleged failure to comply with federal regulations.

(Emphasis added.)

¶41. The trial court did not err by excluding Dunlap's expert testimony on whether the truck was "out of service." Based on Dunlap's proffered testimony, he clearly stated that the truck was *not* out of service, although he would have placed it "out of service" had he inspected it. Notwithstanding his testimony that the truck was not "out of service," this Court has held that violations of traffic laws, in and of themselves, do not amount to strict liability. This Court requires that in order to incur liability when a party is negligent, that negligence also must be the proximate cause of the injury. *See **Jones v. U.S. Fid. and Guar. Co.***, 822 So. 2d 946, 948 (Miss. 2002) ("We note our opinion in ***Richardson v. Adams***, 223 So. 2d 536, 537 (Miss. 1969), establishes that the violation of a statute demonstrates a duty and breach thereof, but not proximate cause of injury which is a question still left for the jury to answer"); *see also **Choctaw Maid Farms, Inc. v. Hailey***, 822 So. 2d 911, 923-24 (Miss. 2002) (this Court held that no punitive damages were warranted where there was no "nexus" between Choctaw's alleged gross negligence and the collision and where Choctaw's trailer had an expired tag, was old, and was missing a log book, among other things). This issue is without merit.

**8. Exclusion of expert testimony on visibility and causation**

¶42. Coupled with the previous argument on whether the truck was "out of service," Carla argues that the trial court erred by excluding expert testimony from Mark Mori, Mark

Dunlap, Dane Maxwell, and Tim Corbitt on the issues of (1) the visibility of the truck, where the truck had no reflective tape, and (2) causation.

¶43. R&R argues, in part, that Carla's complaint was based on a theory of negligence. However, as the case progressed, R&R contends that Carla intended to present a theory of strict liability. R&R bases its ` argument on the opinions expressed by Mori, Dunlap, and Maxwell. The common root of Carla's experts' opinions, R&R claims, was that the trailer was in violation of the FMCSRs for failure to have reflective tape, therefore, the trailer was illegally on the road at the time of the accident. Further, had the trailer not been on the road, then the collision and Preston's subsequent death never would have occurred and, consequently, R&R and Hunter were liable for Preston's death.

### A. Mark Mori

¶44. The trial court qualified Mori as an expert truck driver in pretrial procedures.[5] Carla asserts that Mori's expert report stated that the truck should not have been on the road because it had no reflective tape on it. Mori further opined that it was reckless to have the truck on the road, and Preston was killed as a result of the truck being on the road with no reflective tape, as the truck was barely visible and in violation of the FMCSRs.

¶45. As for the issue of visibility, Mori stated during his deposition testimony that he could not testify whether a person other than himself could have seen the trailer without reflective tape. In keeping with this, Mori also stated that he would have been able to see the trailer

---

[5] Mori was not called as a witness at trial.

lights more than a half mile away under similar conditions on the night of the accident, those being a flat Delta road in the wintertime.

¶46. Mori also stated in his deposition that the truck was required to have reflective tape, however, photographs of the accident showed the truck without any reflective tape. Because the truck had no reflective tape, the truck should not have been on the road and the accident would not have happened. When asked whether any of those issues affected the trailer's visibility, Mori stated "Well, it – it wasn't supposed to be on the road, so whether it's visible or not, it – it's not supposed to be on the road." Mori also stated that R&R and Hunter would be at fault if the truck was on the roadway without reflective tape, regardless of whether the truck was visible to Preston, because the truck was not legally on the road. Mori was not called as a witness at trial.

¶47. On the issue of visibility, the trial court granted R&R's request to exclude Mori's testimony. The trial court reasoned that Mori's opinion, that "[b]y driving at night without reflective tape on the back of the trailer, the driver and operator allowed the trailer to be unrecognizable at night from the rear, thus allowing it to be struck by a following car. I believe that is what happened in this case," was inadmissible, in part, because expert testimony was not needed to assist the jury about driving at night behind a tractor-trailer truck, as it is a common experience. The trial court further stated:

> This witness bases his opinion that [Preston] did not see the trailer primarily, *if not solely*, on the fact that there was an absence of reflective or conspicuity tape on the back of the trailer. In the view of this court, such an opinion, based solely thereon, is not based on sufficient facts. Logically, such an opinion would lead to the conclusion that in the absence of reflective tape, it is impossible for any driver to see any commercial transport tractor trailer at night. For these reasons, Mori is precluded from testifying as to the cause of

22

the accident. To this extent, the motions for the defendants to strike the opinion of this witness is GRANTED.

### B. Mark Dunlap

¶48. As previously stated, the trial court qualified Dunlap as an expert in State and Federal Motor Carrier Safety Codes. Dunlap's expert report opined that Preston's death was due to the truck not being in compliance with the FMCSRs. In addition, Dunlap opined that the truck should not have been on the road and that it posed a hazard to any driver approaching the truck from the rear. In his deposition testimony, Dunlap stated that he was unable to give an opinion on visibility on the night of the accident. "Without being there, I wouldn't be able to say." He also stated that the lack of reflective tape does not make a vehicle invisible. As discussed in the preceding issue, Dunlap's proffered testimony at trial on the issue of causation was that "[t]he only thing that I could comment on is the fact the truck should never have been on the road in the first place. That would be my causation."

¶49. The trial court stated:

> In reviewing the depositions of this witness, it appears that like the witness Mori, Dunlap anticipates offering opinion testimony concerning the visibility of the subject truck at night [citation omitted] and the cause of the accident. While the court will permit this witness to state opinions as to the purpose of certain state and federal regulations, the court remains of the view that testimony regarding the visibility of the trailer at night will not assist the trier of fact and, again, it does not appear to this court that there are sufficient facts and/or data for the witness to testify as to whether *the deceased* would have been able to see the trailer prior to the accident or as to the cause of the accident. Thus, opinions along those lines will not be permitted, and to the extent the defendants' motion seeks to prohibit this witness from testifying and/or offering opinions regarding the visibility of the trailer at night, whether *the deceased* would have been able to see the trailer prior to the accident and/or the cause of the accident, such motion is hereby GRANTED.

### C. Dane Maxwell

¶50.   The trial court qualified Maxwell as an expert on Department of Transportation (DOT) regulations. Maxwell opined in his report that the cause of Preston's death was operating the truck without reflective tape. In his deposition testimony, Maxwell stated that the truck was invisible without the reflective tape. In addition, Maxwell stated that, in order for Preston to have seen the truck, the reflective tape would have had to have been on the bottom and the top right and left hand corners of the truck. He stated that if reflective tape was only on the bottom of the truck, then Preston would not have been able to see the truck because it did not comply with the regulations. When asked whether strict compliance with the regulations was required in order for Preston "to have an awareness that the trailer was in the highway," Maxwell answered in the affirmative. In other words, the truck would not have been visible to Preston, in Maxwell's opinion, because it was not in strict compliance with the regulations.   At trial, Maxwell proffered testimony that the cause of the accident was a "[v]iolation of the conspicuity regulations" and  "[t]hat the fault lies with the Defendants."

¶51.   Like Mori and Dunlap, the trial court excluded testimony from Maxwell on the issues of visibility and causation for the same reasons. The trial court determined that there were insufficient facts and/or data for Maxwell to testify whether Preston would have been able to see the trailer prior to the accident and what was the cause of the accident.

### D. Tim Corbitt

¶52.   Tim Corbitt was offered as an expert in accident reconstruction. The trial court qualified Corbitt as follows:

While this witness will be permitted to interpret any evidence found or not found (*i.e.* skid marks) at the scene of the accident and offer testimony and opinions regarding such evidence and how such evidence relates to the accident, the court remains of the opinion that there are insufficient facts and/or data to allow the witness to give testimony and/or provide opinions as to whether *the deceased* actually saw the truck prior to the impact, This witness will be permitted to offer testimony regarding the Federal Motor Carrier Safety Regulations, their application to the facts of this case and any deficiencies regarding compliance with such regulations by such truck and/or trucking firm. As with the other witnesses, the court is of the view that opinions regarding the visibility, or lack of visibility, of the truck at night would not assist the trier of fact. For that reason, this witness will not be permitted to offer testimony or opinions as to whether this truck was visible to *the deceased* prior to the accident. However, the witness will be permitted to offer an opinion regarding the visibility of the trailer from the point of view of a reasonably prudent driver, including how far away from the trailer a reasonable prudent driver would have been able to see the trailer at night if it was properly equipped with reflective tape.

(Emphasis in original.)

¶53. As to visibility, Corbitt testified at trial that a reasonably prudent person would have seen only the lights of the trailer on the night of the accident as opposed to the entire outline of the trailer, had it had the required conspicuity tape. He also testified to a "silhouette effect" that occurs mainly at night in dimly lit areas which acts to hide the trailer.[6]

¶54. Corbitt also stated that he had reviewed the FMCSRs, and that R&R had an obligation to have reflective tape on the truck on the night of the accident. Corbitt testified that a reasonably prudent person would not have been able to see the truck at the time of the

---

[6] Corbitt, in regard to the "silhouette effect," stated:

This is mostly happening at night and when you have areas of unlit or dimly lit road because of ambient lighting from other areas it actually hides trailers. The reasonable driver, they approach them, they don't really notice them, they are not determining their rate of closure on them, all they're seeing are red dots on the horizon.

25

accident. He stated that to solve "red dot confusion," where lights appear as reddish dots in the distance, conspicuity tape should be added to a vehicle. Also, Corbitt testified that conspicuity tape would aid to alert a reasonably prudent person that a trailer is ahead on the roadway. In general, he stated that reflective tape would give greater visibility of the trailer at a further distance.

¶55. The trial court did not err by limiting all experts' opinions on the issue of whether the truck was visible to Preston on the night of the accident. Mori and Dunlap stated in one form or another that they were not present at the time of the accident and, therefore, could not state what Preston may have seen. Maxwell stated that the truck was invisible because it lacked the reflective tape. However, Maxwell was of the opinion that if the truck was in compliance with the FMCSRs, then the truck would have been visible. The trial court permitted Corbitt to testify at trial as to visibility with regard to what a reasonably prudent person, not Preston in particular, would have seen on the night of the accident. The trial court's decision, and its more lenient admission of testimony from Corbitt on the issue of visibility, was proper. None of the expert witnesses had the requisite knowledge to know what Preston may or may not have seen on the night of the accident. Any opinion on what Preston would have seen would be mere speculation.

¶56. The jury heard testimony from various witnesses that the trailer had no reflective tape in violation of the FMCSRs. The jury also heard that reflective tape was designed to alert drivers to the presence of trucks ahead on the roadway, and that the absence of the tape would reduce visibility. Accordingly, the issue of visibility, or lack thereof, of the trailer was presented to the jury for consideration. The testimony on visibility was not expressed in

terms of Preston's actual ability to see the truck on the night of the accident, however, without Preston's testimony, which unfortunately was not possible in this case, any testimony concerning this was properly excluded. Therefore, the trial court did not err by refusing this testimony pursuant to Rules 401, 403, and 702.

¶57. As to causation, the trial court properly excluded testimony from Mori, Dunlap, Maxwell, and Corbitt pertaining to causation.[7] The trial court reasoned that there was not sufficient facts or data upon which to base an opinion as to causation. These witnesses basically held R&R and Hunter to a strict-liability theory that the truck should never have been on the road because it had no reflective tape in violation of FMCSRs and, consequently, the reduced visibility of the truck caused Preston's death. As some of the witnesses agreed, they could not testify what Preston saw on the night of the accident. Since they could not testify concerning Preston's visibility, they could not state whether the lack of reflective tape caused the accident. Therefore, the trial court did not err by excluding their proposed theories as to causation.

### 9. Expert Bentley

¶58. Carla next argues that the trial court erred by permitting defense expert witness John Bentley to testify concerning issues previously limited by court order. The trial court ordered that Bentley's opinion would be limited to that of a *reasonably prudent driver* approaching from the rear. This ruling was similar to limits placed on Carla's expert witnesses.

---

[7] Mori did not testify at trial. Dunlap, Maxwell, and Corbit did testify at trial, although the trial court limited some or all of their testimony on the issues of visibility and causation, as previously addressed.

¶59. Carla asserts that the trial court erroneously permitted two previously limited statements during Bentley's direct examination. The first statement was elicited after defense counsel asked Bentley his opinion on whether Preston Utz had ample time and distance to avoid the collision. The following exchange occurred:

Q. And reviewing the testimony and listening to the testimony these last few days, do you have an opinion, based on reasonable engineering certainty, as to whether or not Preston Utz had ample time and distance to avoid the impact with the tractor-trailer?

A. Yes, sir.

Q. And what is that opinion?

A. That there was sufficient time and distance available to Mr. Utz to comfortably slow his vehicle or make a lane change to the left lane.

Counsel for Carla requested to approach the bench and then objected to the first statement. The trial court asked why the objection was not made before Bentley testified. After further discussion, the trial court overruled the objection. The second opinion elicited was as follows:

Q. Mr. Bentley, would a reasonably prudent driver have had ample time and distance to avoid collision with this trailer?

A. Yes, sir.

Q. Tell us what is the basis for your opinion?

¶60. Counsel for Carla requested to approach the bench when Bentley was questioned on the second statement and objected to the question. The trial court reconsidered the issue and remedied the first statement by sustaining the objection, in effect, by giving Carla the option of either instructing the jury to disregard the testimony or rebutting the testimony with

28

another witness. Carla chose to rebut the testimony with testimony from Corbitt, her expert. Corbitt rebutted Bentley's testimony by stating that Preston did not have ample time and distance to avoid impact with the trailer. As for the second statement, the question and answer conformed to the proper limitation imposed by the trial court. Defense counsel phrased the question in terms of a "reasonably prudent driver." This issue is without merit.

### 10. Exclusion of reflective tape documents

¶61. Carla next argues that the trial court erred by excluding a number of documents concerning reflective tape. The documents contained information on reflective tape and its ability to prevent accidents. Carla asserts that the documents were used by her experts and as evidence of what reflective tape is, why it is used on trailers, and its cost. She claims that she was prejudiced when the trial court denied her experts the opportunity to use this information and/or allow evidence to be presented to the jury on the visibility issues. Carla

identified the documents as P-9 through 20.[8]  Exhibits P-9 and P-14 were admitted into evidence during the trial and, therefore, are not at issue before this Court.

¶62.  The trial court excluded the other documents because they were prepared by private organizations, most were marketing devices, and they were hearsay.  The trial court did not err by excluding the documents as hearsay.  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Miss. R. Evid. 801.  The documents, by Carla's own explanation, would be hearsay, as they would be used to prove the truth of the matter asserted, that being what constitutes reflective tape, why it is used, its cost, and its effects in connection with accidents.

¶63.  Notwithstanding this, Carla was not prejudiced by the exclusion of these documents. The jury had the opportunity to view Exhibit 8 – the *Effectiveness of Retro Reflective Tape on Heavy Trailers*; Exhibit 9 – *FMCSA's Conspicuity Requirements for Commercial Motor*

---

[8]  The excluded documents were as follows:

| | |
|---|---|
| Exhibit P-10: | 3M Information on Conspicuity Tape; |
| Exhibit P-11: | J.J. Kelly 2007 Transportation Catalog Conspicuity Tape Information; |
| Exhibit P-12: | Safety Bulletin 01-03 December 27, 2001: Retroflective Tape on Cargo Tank Trailers; |
| Exhibit P-13: | Public Citizen: NHTSA Date (sic) Show Safety Cost Little, Saves Thousands; |
| Exhibit P-15: | Underride Network Victims First; |
| Exhibit P-16: | Auto Safety Expert.com: Truck Conspicuity; |
| Exhibit P-17: | Newsline: NHTSA Study Confirms Reflective Tape on Trucks Reduces Crashes; |
| Exhibit P-18: | Underride Network Victims First/The Visible Semi; |
| Exhibit P-19: | Does your truck trailer have reflective tape; and |
| Exhibit P-20: | Avery Dennison vehicle conspicuity tape catalog. |

*Vehicle*, and Exhibit 14 – *Recognizing a Truck at Night Shouldn't Be a Hit or Miss Proposition*. In addition, Carla had Dunlap, Maxwell, and Corbitt give testimony concerning the purpose for reflective tape, the FMCSRs concerning reflective tape, whether the R&R truck had reflective tape, and how reflective tape, or lack thereof, could affect a person's ability to see a truck. The jury also had actual photographs depicting the R&R truck, taken at the scene on the night of the accident. Accordingly, the trial court did not err by excluding proposed documents P-10 through 13 and P-15 through 20.

### 11. Exclusion of photographs

¶64. Carla next argues that the trial court erred by excluding the following photographs: (1) two color photographs of exemplar trucks (P-34), and (2) twenty-six photographs of the trailer at issue in the case (P-36). Carla offered these photographs as comparisons for the jury. She argued that the photographs of the exemplar trucks would show the jury what a trailer in proper compliance with the FMCSRs would have looked like and what Preston would have seen, had the trailer been in compliance. On the other hand, Carla offered the photographs of the actual trailer driven by Hunter to show the jury how the trailer appeared on the night of the collision.

### A. Exemplar truck

¶65. The trial court denied the photographs of the exemplar truck. The photographs of the exemplar truck showed the proper placement of the conspicuity tape. The trial court denied the first photograph, finding that the picture could be misleading to a jury, because the picture was taken in the daylight. The accident, of course, occurred at night. The trial court refused the second photograph because it depicted the truck from a side angle that Preston

31

would not have seen on the night of the accident. In addition, the trial court determined that it had allowed other exhibits, such as P-9, *FMCSA's Conspicuity Requirements for Commercial Motor Vehicle,* which illustrated the proper placement of conspicuity tape on trucks.

¶66. The trial court did not err by refusing to admit the photographs of the exemplar trucks. The trial court allowed and Carla later admitted Exhibit P-9, entitled *FMCSA's Conspicuity Requirements for Commercial Motor Vehicles*, into evidence. This publication included many colored illustrations of trailers with the proper placement of conspicuity tape on them. Furthermore, numerous witnesses testified to the lack of placement of the conspicuitiy tape on R&R's truck on the night of the accident. The jury also saw at least six photographs depicting the rear of the actual truck driven by Hunter on the night of the accident. Therefore, the trial court did not err by refusing to admit the photographs of the exemplar truck. The jury had numerous illustrations of a truck with proper conspicuity tape; heard witness testimony concerning the correct placement of the tape and the lack of placement of the tape by R&R; and viewed many photographs of the R&R truck immediately after the collision. We find that the jury had ample opportunity to compare what a truck with proper conspicuity tape would look like versus what R&R's truck looked like on the night of the accident.

**B. Hunter's truck**

¶67. The trial court refused to admit twenty-six photographs of the tractor-trailer involved in the collision with Preston. However, the trial court held that it would reconsider its ruling if the plaintiff presented evidence that demonstrated that the trailer was in the same or

32

substantially the same condition as it was on the night of the accident, particularly in regard to the issue of the conspicuity tape.

¶68. The evidence showed that the bumper of the R&R truck was knocked forward in the collision. The original bumper was not reattached to the trailer. After the collision, the bumper was placed in a metal scrap pile. Carla also had Exhibit P-33 admitted into evidence. This exhibit contained two photographs. One of the photographs depicted the back of the trailer approximately six hours after the accident with no bumper.

¶69. The testimony also revealed that the next morning after the accident, R&R replaced the bumper with another bumper. The truck then finished its run to Louisiana and returned to the R&R lot.

¶70. Most of the twenty-six photographs that Carla now complains that the trial court erred by excluding were of the rear view of the trailer. These pictures, taken more than a year after the accident, showed the rear of the trailer with a bumper. Based on the evidence, the trial court did not err by excluding these photographs. The testimony revealed that the bumper of the R&R truck was knocked off during the accident. Indeed, pictures from the night of the accident show Preston's vehicle partially under the truck with no visible bumper. The original bumper was replaced with another bumper, and the original bumper was discarded after the accident. Carla elicited testimony that the bumper was knocked off and replaced by a different bumper. She also had Exhibit P-33 admitted into evidence, which depicted the rear of the truck hours after the collision, with no bumper. This was consistent with the evidence that no bumper was attached to the truck after the collision.

33

¶71. Similar to the discussion on the exemplar truck photographs, the jury had the opportunity to compare what a truck with proper conspicuity tape would look like versus what the R&R truck looked like on the night of the accident. The twenty-six photographs of the trailer, taken more than a year later, would not have been helpful to the jury as they did not depict the truck in the same condition as it was at the time of the collision. The photographs offered by Carla showed the trailer in the daylight with an attached bumper, whereas the collision occurred at night and the bumper was knocked off the trailer due to the collision. The trial court did not err by excluding these photographs.

**12. Exclusion of expert testimony from Tim Corbitt on the issues of yielding right-of-way and immediate hazard**

¶72. Carla next argues that the trial court erred by finding as a matter of law that (1) forty to forty-five miles per hour is not an unreasonably slow speed, and (2) two-and-one-half miles is insufficient to create an immediate hazard. This argument is tied to Carla's arguments on the corresponding proposed jury instructions P-17 and P-18, respectively.

¶73. The trial court determined that the slow speed and the two-and-one-half miles entry on the highway by R&R before the collision did not create an immediate hazard. The evidence at trial showed that Hunter stated that he was going about forty to forty-five miles per hour when the accident occurred. Trooper Shive stated that Hunter had told him at the scene of the accident that he had been traveling about forty miles per hour. The posted speed limit was sixty-five miles per hour. Highway 61 had no minimum posted speed. Additionally, Highway 61 was not a limited-access road. This meant that vehicles could

34

enter Highway 61 at countless points along the roadway, and that a driver on Highway 61 would have to be alert for other vehicles entering the highway at various points.

¶74. The accident occurred close to midnight, and no testimony was solicited that there was any "flow" of traffic other than R&R's truck and Preston's vehicle on the flat stretch of road where the accident occurred. Further, the testimony revealed that the right-hand lane was considered the slow lane. Hunter had left the R&R lot and had traveled approximately two and one-half miles south of the facility before the collision. When Hunter left the R&R lot, he immediately pulled into the right-hand lane, although he conceded that the truck may have "tipped" into the left-hand lane as he was entering the highway. However, Hunter "immediately" pulled the truck into the right-hand lane. The R&R truck traveled in the right-hand lane, and the accident occurred in the right-hand lane.

¶75. Corbitt opined that forty to forty-five miles per hour was too slow a speed, impeding the flow of traffic and creating an unusual or emergency situation. However, based on the described testimony at trial, the trial court did not err by refusing Carla's instruction, P-17, as there was no evidence that Hunter drove the R&R truck at a speed or in a manner that constituted a hazard to the flow of traffic.

¶76. The trial court did not err by finding that there was insufficient evidence that two and one-half miles was insufficient to create an immediate hazard and, thus, refusing proposed jury instruction P-18. Jury instruction P-18 stated, in part, that "the operator of a vehicle about to enter or cross a street from a road or driveway is under a duty to yield the right-of-way to all vehicles approaching on the street so close as to constitute an immediate hazard." The instruction further stated that if the jury found, by a preponderance of the evidence, that

Hunter was about to enter or cross Highway 61 at the time when Preston was approaching on the road so close as to constitute an immediate hazard, and Hunter failed to yield the right-of-way, and the failure to yield was the sole proximate cause or the proximate contributing cause of Preston's injuries, then, the verdict should be for the plaintiff.

¶77. The evidence, as already discussed, showed that Hunter entered the highway and traveled a distance of two and one-half miles prior to the collision. There was no evidence that Hunter pulled in front of Preston on the highway.

## II. Jury Instructions

¶78. The general rule with regard to jury instructions is that the trial court has considerable discretion when instructing the jury, and the instructions are to be read as a whole. *Bickham v. Grant*, 861 So. 2d 299, 301 (Miss. 2003). A litigant is entitled to have jury instructions that present his theory of the case. *Young v. Guild*, 7 So. 3d 251, 259 (Miss. 2009). However, a trial judge may refuse a proposed jury instruction that is an incorrect statement of the law, repeats a theory covered in other instructions, or has no proper foundation in the evidence before the court. *Cato*, 15 So. 3d at 423. On appeal, the appellate courts analyze whether a jury instruction correctly stated the law and was supported by the evidence. *Young*, 7 So. 3d at 259 (citing *Beverly Enters. v. Reed*, 961 So. 2d 40, 43-44 (Miss. 2007)). Nonetheless, "[i]f other instructions granted adequately instruct the jury, a party may not complain of a refused instruction on appeal." *Id.* (quoting *Southland Enters. v. Newton County*, 838 So. 2d 286, 289 (Miss. 2003)). When analyzing jury instructions as a whole, "'[d]efects in specific instructions will not mandate reversal when all of the instructions,

taken as a whole fairly–although not perfectly–announce the applicable primary rules of law.'" ***Id***. (quoting ***Beverly Enters.***, 961 So. 2d at 43)).

### 1. Jury Instruction P-7

¶79. Carla argues that the trial court erred by denying jury instruction P-7 on proximate cause. Instead, the trial court gave jury instruction C-10 on proximate cause. Jury instruction C-10 stated:

> A cause constitutes a proximate cause of an injury when such injury results from a chain of a natural and unbroken sequence from the defendant's negligent act. A defendant is not liable for damages which are remote or collateral, or which result from a remote, improbable, or extraordinary occurrence, although such occurrence is within the range of possibilities flowing from the defendants' negligent act.
>
> If you find from a preponderance of the evidence that the death of Preston Jimmy Utz resulted from a chain of natural and unbroken sequence (sic) from the defendants' failure to comply with the Federal Motor Carrier Safety Regulations, then your verdict shall be for the plaintiff. However, if you find the death of Preston Jimmy Utz was the result of a remote, improbable, or extraordinary occurrence, although within the range of possibilities flowing from the defendants' negligence, your verdict shall be for the defendants.

The record reveals that, when opposing counsel and the trial court were discussing jury instructions, the trial court did not like either of the parties' jury instructions on proximate cause and suggested its own jury instruction. After discussion from all parties, the trial court approved jury instruction C-10. When asked for comment by the trial court, the response by counsel for Carla was "I'm okay with that instruction." In other words, Carla had no objection to the trial court giving the proximate-cause jury instruction C-10.

¶80. On appeal, Carla now claims that the trial court erred by giving this instruction, as it was a misstatement of law and incomplete. This Court has held that where counsel fails to

raise an objection to a jury instruction, the issue is procedurally barred. ***Jordan v. State***, 995 So. 2d 94, 114 (Miss. 2008) (citing ***Rubenstein v. State***, 941 So. 2d 735, 779 (Miss. 2006)). Carla did not object to jury instruction C-10 being a misstatement of law or incomplete during the discussion of instructions.

¶81.    Notwithstanding this bar, Carla contends that the language that the death of Preston was a result of "a remote, improbable, or extraordinary occurrence, although within the range of possibilities" is an incorrect statement of law.  She maintains that the proper statement of law is that the standard of care applicable when a party charged with negligence is whether the person acted as a reasonable and prudent person would have under the same or similar circumstances.  In ***Dillon v. Greenbriar Digging Service, Ltd.***, 919 So. 2d 172, 178 (Miss. Ct. App. 2005), the Court of Appeals upheld similar language in a jury instruction.  Like the instruction in ***Dillon***, jury instruction C-10 was similar to language contained in one of the Mississippi Model Jury Instructions.[9]   The Court of Appeals upheld a jury instruction in ***Dillon*** that had language similar to the Mississippi Practice Model Jury Instruction Civil

_____

[9] Mississippi Practice Model Jury Instructions Civil Section 15:2 states:

You are instructed that the defendant is not liable for all injuries that flow from _____ *[his negligence, if any or his wrongful act, if any or his chargeable conduct at issue in this suit]*, but only for those that could have been reasonably foreseen and anticipated.  The injuries suffered by plaintiff must result from a chain of a natural and unbroken sequence from defendant's _____ *[chargeable, wrongful or negligent]* act.  However, the defendant is not liable for damages which are remote or collateral, or which result from a remote, improbable or extraordinary occurrence, although such occurrence is within the range of possibilities flowing from defendant's _____ *[chargeable, wrongful or negligent]* act.

Miss. Prac. Model jury Instr. Civil § 15:2. (Emphasis in original.)

38

Section 15:2, which states, in part, that there is no liability to a defendant "for damages which are remote or collateral, or which result from a remote, improbable, or extraordinary occurrence, although such occurrence is within the range of possibilities" that flow from a defendant's negligent act. Furthermore, a jury instruction providing the standard of care for negligence case was given by the trial court. Jury instruction C-4 provided:

> Negligence is the failure to use reasonable care. Reasonable care is that degree of care which a reasonably careful person would use under like or similar circumstances. Negligence may consist either in doing something that a reasonably careful person would not do under like or similar circumstances, or in failing to do something that a reasonably careful person would do under like or similar circumstances.

A party cannot complain about a refused instruction where the instruction, as given, adequately instructs the jury. *Young*, 7 So. 3d at 259. This Court analyzes jury instructions as a whole. *Id*. "In considering whether the grant or refusal of an instruction constitutes reversible error, we read the instructions actually given as a whole and will not reverse a verdict so long as the instructions, taken together, fairly announce the law of the case and create no injustice." *Mariner Health Care, Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138, 1154 (Miss. 2007) (citing *Whitten v. Cox*, 799 So. 2d 1, 16 (Miss. 2000)). The trial court did not err by refusing jury instruction P-7 or by giving jury instruction C-10. When the jury instructions were read as a whole, they fairly informed the jury of the law and created no injustice to Carla.

**2. Jury Instructions P-10, P-11, P-12, P-13, P-14, P-15, and P-16 and C-13**

¶82. Carla contends that the trial court erred by denying jury instructions P-10 through P-16 relating to R&R's and Hunter's alleged violation of numerous FMCSRs. She argues that

the trial court's denial of jury instructions P-10 through P-16 was erroneous because the evidence supported the instructions, and the FMCSR violations showed the proximate cause of Preston's death. More specifically, the trial court denied jury instructions P-10 (general failure to comply with the FMCSRs); P-11 (failure to have reflective tape); P-12 (failure to conduct a pre-trip inspection); P-13 (failure to conduct a post-trip inspection); P-14 (operating the trailer in such a condition as to likely cause an accident); P-15 (failure to inspect and repair a trailer while in defendants' control); and P-16 (failure to operate the trailer with reflective tape). Having resolved to give jury instruction C-13, the trial court refused Carla's jury instructions P-10 through P-16 and, in the denial of post-trial motion, characterized these instructions as "superfluous."

¶83. As to jury instruction C-13, which was given to the jury, Carla argues that C-13 denied her the right to present multiple and separate FMCSR violations by R&R and Hunter to the jury. Additionally, Carla contends that, while C-13 instructs the jury that R&R's and Hunter's failure to comply with the FMCSRs is negligent, thereby seemingly being a negligence-per-se instruction, it then requires her to show that this negligence proximately caused Preston's death. Coupled with these arguments is Carla's further contention that the trial court erred because it prohibited her from admitting evidence of FMCSR violations via expert testimony on taillight visibility, the trailer being "out of service," and failure to use reflective tape, as discussed in previous issues.

¶84. The trial court allowed jury instruction C-13, which provided:

> The court instructs the jury that the defendants, Running & Rolling Trucking, Inc., and Anthony Q. Hunter were negligent in failing to comply with the requirements of the Federal Motor Carrier Safety Regulations.

40

However, the fact that this court has directed a finding of negligence against these defendants does not, in and of itself, mean that these defendants are liable for the death of the deceased. Before you may find these defendants liable for the death of Preston Jimmy Utz, you must also find that such negligence, the failure of the defendants to comply with the Federal Motor Carrier Safety Regulations, was a proximate cause and/or proximate contributing cause to the death of Preston Jimmie Utz.

¶85.  In **Thomas v. McDonald**, 667 So. 2d 594, 596-597 (Miss. 1995), this Court stated:

[W]here there is a statute, the statute will be the controlling law for the parties' action or failure to act. *See* **Haver v. Hinson**, 385 So. 2d 605, 608 (Miss. 1980) (statutes delineate negligent conduct). Violations of statutes generally constitute negligence per se. **Travis v. Hartford**, 630 So. 2d 337, 342 (Miss.1993); **U-Haul Co. v. White**, 232 So. 2d 705, 708 (Miss. 1970).

¶86.  The Court further stated:

The principle that violation of a statute constitutes negligence per se is so elementary that it does not require citation of authority. When a statute is violated, the injured party is entitled to an instruction that the party violating is guilty of negligence, and if that negligence proximately caused or contributed to the injury, then the injured party is entitled to recover.

**Thomas**, 667 So. 2d at 596-597 (quoting **Bryant v. Alpha Entertainment Corp**., 508 So. 2d 1094, 1096 (Miss.1987)).

¶87.  While **Thomas** provides that violations of statutes constitute negligence per se, this does not relieve a party from the burden of showing that the negligence of the opposing party proximately caused or contributed to the injury suffered by a complainant. **Thomas**, 667 So. 2d at 596-97. **Thomas** states that when a statute is violated, a party is entitled to an instruction on negligence. However, in order to recover damages for an injury, that negligence (violation of a statute) must have proximately caused or contributed to the injury. *Id*. In other words, a violation of a statute, in and of itself, does not dictate that either (1) the violation was the proximate or contributing cause of an injury suffered by a party, or (2)

41

recovery for damages is imminent. Granted, the FMCSRs are regulations, not statutes, nevertheless, the logic holds true for the instructions at issue before this Court. Further, jury instruction C-13 provided that R&R and Hunter were negligent for failure to follow the FMCSRs. Carla's contention that the instruction required her to prove that R&R's and Hunter's negligence proximately caused or contributed to the injury is without merit, because this requirement is supported by Mississippi law. *Thomas*, 667 So. 2d at 596-97. Accordingly, the trial court properly refused Carla's instructions.

### 3. Jury Instruction P-17 (operating at a slow speed)

¶88. Carla next contends that the trial court erred by denying jury instruction P-17 concerning negligence of a driver operating a vehicle at a speed and manner which would constitute a hazard to the flow of traffic or to other vehicles traveling in the same roadway. The trial court determined that the evidence was insufficient to support the instruction. When discussed further, the trial court also found that the tractor-trailer's speed was not unreasonably slow as a matter of law.

¶89. Hunter, the tractor-trailer driver, testified that he was traveling between forty to forty-five miles per hour in the right-hand lane at the time of the collision. The posted speed limit at the site of the collision was sixty-five miles per hour. Trooper Shive testified that Highway 61 had no minimum speed limit, and vehicles regularly traveled at forty to forty-five miles per hour. He also stated that the right lane is for slower traffic. Trooper Shive was called to the scene of the accident at 11:50 p.m., and he arrived shortly thereafter at 11:59 p.m. No evidence suggested that any other vehicles were traveling on that stretch of Highway 61.

¶90.    Carla cited ***Wheat v. Teche***, 179 So. 553 (Miss. 1938), for the holding that the operation of a motor vehicle at less than the fixed rate of speed may be negligent and is a question for the jury. *Id*. at 555.   The trial court considered ***Wheat*** during discussions on jury instructions and found the facts distinguishable from Carla's case. We agree. In ***Wheat***, this Court reversed and remanded a trial court's grant of directed verdict in favor of Teche Lines. *Id*. Wheat was standing by the side of the roadway in front of his truck when a Teche Lines bus passed within one foot of Wheat, causing particles from rocks and slag to strike Wheat and injure his eye. *Id*. at 554.   The roadway at that particular point had a gravel-like surface, was red-flagged, and had thirty-six feet of clear space, yet the Teche Line bus drove within one foot of Wheat at no more than fifty miles per hour. *Id*.   The Court found that under those facts, the jury should determine whether the bus driver was traveling on the roadway at a reasonable rate of speed, exercised reasonable care, and could have reasonably foreseen the possibility of injury. *Id*. at 554-55.

¶91.    The facts in Carla's case are distinguishable from ***Teche***.   The statutes at issue were different in the two cases, and no evidence was presented to show a hazard to the flow of traffic.   This is true because Hunter drove no more than forty-five miles per hour, traveled in the right-hand lane of two southbound lanes, and the accident occurred two and one-half miles from Hunter's point of entry onto Highway 61. This Court has held that a trial court may refuse a jury instruction that is not supported by the evidence. ***Cato***, 15 So. 3d at 423. The trial court did not err, because the evidence was insufficient to support the instruction.

### 4.  Jury Instructions P-18 and P-19 (yielding)

43

¶92.    Carla next argued that the trial court erred by refusing jury instructions P-18 and P-19, as they established some of her theories of liability.  Both instructions concerned yielding the right-of-way.  Jury instruction P-18 stated in part that an "operator of a vehicle about to enter or cross a street from a road or driveway is under a duty to yield the right-of-way to all vehicles approaching on the street so close as to constitute an immediate hazard."  Jury instruction P-19 stated in part that "a driver must yield the right of way to another vehicle that has already established control of the driving lane."[10]  The trial court refused both instructions because of insufficient evidence.

¶93.    The record revealed that Hunter came to work at approximately 10:30.  When he left the R&R lot located in Merigold, Mississippi, in the tractor-trailer, he drove south on Highway 61.  When Hunter entered the highway, he probably "tipped" the left-hand lane, however he immediately got into the right-hand lane.  The accident occurred approximately two or two and one-half miles *after* Hunter entered Highway 61.

---

[10] In support of her proposed jury instruction, Carla cited Mississippi Code Section 63-3-801 which states:

> (1) Except as may otherwise be provided in this article, the driver of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection from a different highway.

> (2) Except as may otherwise be provided in this article, when two vehicles enter an intersection from different highways at the same time the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right.

Miss. Code Ann. § 63-3-801 (Rev. 2004).

44

¶94.    With regard to P-18, Carla relies on *Reese v. Summers*, 792 So. 2d 992 (Miss. 2001) (citing *Thomas*, 667 So. 2d at 596) to support her position that whether a particular circumstance rises to the level of an emergency or unusual situation is a question for the jury. However, the trial court did not err by refusing these instructions. The record contains no evidence to show that Hunter or Preston were in close proximity to each other at an intersection when Hunter entered Highway 61. The accident occurred two and one-half miles after Hunter had entered the highway from the R&R lot and had been traveling in the right hand lane. This Court has held that a trial court has considerable discretion when instructing the jury. *Bickham*, 861 So. 2d at 301. A jury instruction may be refused by a trial court when it is unsupported by the evidence. *Cato*, 15 So. 3d at 423. Based on the evidence provided, this Court cannot say that the trial court erred by refusing these instructions.

### 5. Jury Instruction P-20

¶95.    Carla contends that the trial court erred by refusing jury instruction P-20, which concerned Mississippi Code Section 63-3-701.[11] The statute governs starting a stopped, standing, or parked vehicle when movement could not be made with reasonable safety. The trial court refused the instruction because it found no evidence to support it.

---

[11] Mississippi Code Section 63-3-701 states:

No person shall start a vehicle which is stopped, standing, or parked unless and until such movement can be made with reasonable safety.

Miss. Code Ann. § 63-3-701 (Rev. 2004).

45

¶96.   Carla argued that R&R and Hunter were violating the FMCSRs, thus the tractor-trailer could not be operated or moved safely. The record reveals that Hunter entered Highway 61 in a southbound direction. Some two to two and one-half miles later, the collision occurred between the tractor-trailer driven by Hunter and the vehicle driven by Preston. There was no evidence that Hunter had stopped or parked the tractor-trailer after he had entered Highway 61. The jury was instructed, via jury instruction C-13, that R&R and Hunter were negligent by violating the FMCSRs. Indeed, the jury, in special interrogatory C-19, found that R&R's and Hunter's negligence for violating the FMCSRs was not a proximate cause and/or a proximate contributing cause of the death of Preston. This Court finds that the trial court did not err by refusing P-20, as there was no evidence to support the instruction that the tractor-trailer could not be operated or moved safely at the time it left R&R's lot. *Cato*, 15 So. 3d at 423; *Young*, 7 So. 3d at 259.

### 6. Jury Instructions P-21 and P-29

¶97.   Carla argues that the trial court erred by refusing jury instructions P-21 and P-29, which concerned "an unusual condition or emergency." Jury instruction P-21 stated in part that "generally when two vehicles are traveling in the same direction the driver of the second vehicle is not negligent for striking the rear of the first vehicle when the collision is a result of an unusual condition or emergency created by the first vehicle." Jury instruction P-29 stated in part that "[g]enerally, when two cars are traveling in the same direction, the primary duty of avoiding collision rests with the second driver in the absence of an emergency or unusual condition." The trial court refused both instructions based on insufficient evidence. In its post-trial order, the trial court also stated that the lack of reflective tape, as noted in P-

46

21, or failure to comply with the FMCSRs, as noted in P-29, bordered on a theory of strict liability, and the lack of reflective tape was not the type of unusual condition or emergency contemplated in the statute. The trial court also found that the instructions were superfluous.

¶98. The trial court did not err by refusing P-21 and P-29. The jury was instructed that R&R and Hunter were negligent for violating the FMCSRs in jury instruction C-13. After hearing all the evidence, including that the trailer had no reflective tape, the jury found in favor of R&R and Hunter, indicating that the lack of reflective tape and the violations of the FMCSRs were not the proximate cause or proximate contributing cause of the collision. No other facts inferred an unusual condition or emergency. The trial court has considerable discretion when instructing the jury. *Bickham*, 861 So. 2d at 301. A trial judge may refuse a proposed jury instruction that has no proper foundation in the evidence before the court. *Cato*, 15 So. 3d at 423; *Young*, 7 So. 3d at 259. This issue is without merit.

### 7. Jury Instruction D-1

¶99. Carla argued that the trial court erred by giving jury instruction D-1, which was submitted as C-14. She claims that the instruction placed an absolute duty on Preston to avoid the collision. Carla cited to *White v. Miller*, 513 So. 2d 600, 601 (Miss. 1987), for authority that a driver does not have an absolute duty to avoid a collision.

¶100. In *White*, a vehicle traveling in front of the Whites' vehicle made a turn. *White*, 513 So. 2d at 601. The Whites had stopped their vehicle for at least thirty seconds to allow the preceding vehicle to make the turn when Miller struck the rear of the Whites' vehicle. *Id*. Miller testified that she was traveling one car length behind the Whites when she saw their brake lights and they stopped, however, when she applied her brakes, she could not stop her

47

vehicle. *Id*. However, the Court in *White* clearly made a distinction between a vehicle that "suddenly darts" out into the path of a driver versus an object, such as the Whites' vehicle, that is discernible and in the range of vision or clearly in the distance ahead of a driver. *Id*. at 601-02. This Court stated:

> This Court has never adopted a per se rule that the driver of the following car is negligent if he collides with the rear of a preceding vehicle, nor do we in this case. Rather we would mind the warning stated in *Jones v. Hatchett*, 504 So. 2d 198, 204 (Miss. 1987), that instructions on a driver's duty to drive at a speed sufficiently slow to enable him to stop within his range of vision "should not be interpreted or applied to impose on a driver an absolute duty to avoid a collision. Such an interpretation would indicate that a driver had a duty to avoid a vehicle which suddenly darted out into his path ten feet in front of him." But a car that suddenly darts into a driver's path ten feet in front of him is not "an object discernible in the range of his vision or in the assured clear distance ahead," as was the White vehicle in relation to Mrs. Miller.

*Id*. This Court reversed the decision for failure to direct a verdict on the issue of negligence and remanded the case on the issue of damages. *Id*. at 603.

¶101. The trial court noted Carla's objection and stated that the case law supported the word "absolute" given in the instruction. The instruction stated:

> You are instructed that under the law of this state a motorist has an absolute duty to see that which is in plain view or open and apparent and to take notice of obvious objects and vehicles ahead on a highway. A motorist also has a duty to be alert on a highway and has no right to assume a highway is clear.
>
> If you find from a preponderance of the evidence that the trailer pulled by Anthony Q. Hunter would have been visible to a reasonably prudent driver in the position of Preston Utz at a point where the accident could have been avoided through the exercise of reasonable care, then you must find Preston Utz was negligent.
>
> If you find that negligence on the part of Preston Utz, if any, was the sole proximate cause of the accident, then it is your sworn obligation to return a verdict for the Defendants.

48

However, if you find that this negligence on the part of Preston Utz, if any, was a proximate contributing cause of the accident, then you must assign a percentage of fault to Preston Utz, as explained later in these instructions.

¶102.  In ***Dennis By and Through Cobb v. Bolden***, 606 So. 2d 111, 113 -114 (Miss. 1992) this Court had held:

> The driver of a car is charged with the duty of keeping a proper lookout and being on alert for vehicles, objects and persons ahead in the highway. ***Fowler Butane Gas Co. v. Varner***, 244 Miss. 130, 141 So. 2d 226 (1962); ***Belk v. Rosamond***, 213 Miss. 633, 57 So. 2d 461 (1952).  The driver is charged with the <u>absolute duty</u> of seeing what he should have seen. ***Tippit v. Hunter***, 205 So. 2d  267 (Miss. 1967); ***Campbell v. Schmidt***, 195 So. 2d 87 (Miss. 1967); ***Layton v. Cook***, 248 Miss. 690, 160 So. 2d 685 (1964).  He is also required to have his car under proper control, to be on the alert on the highway, and avoid striking plain objects.  ***Barkley v. Miller Transporters, Inc.***, 450 So. 2d 416 (Miss. 1984); ***Shideler v. Taylor***, 292 So. 2d 155 (Miss. 1974).

***Bolden***, 606 So. 2d at 113-14 (emphasis added).  While ***Bolden*** states that the driver has an "absolute" duty to see what he should have seen, the caselaw on which it relies for authority did not require an "absolute" duty. ***Id***. (citing ***Tippit v. Hunter***, 205 So. 2d 267 (Miss. 1967); ***Campbell v. Schmidt***, 195 So. 2d 87 (Miss. 1967); ***Layton v. Cook***, 248 Miss. 690, 160 So. 2d 685 (1964)).  Notwithstanding the use of the term "absolute," giving the instruction is not reversible error.  But for the use of "absolute," the statement of law was accurate.  The instruction did not place, as Carla claimed, an absolute duty on Preston to avoid the collision.  The instruction provided that the jury should find Preston negligent only if the trailer  would have been visible to a reasonably prudent driver in Preston's position and  the accident could have been avoided through the exercise of reasonable care.  Further, Carla's argument that ***White*** provides no absolute duty to avoid a collision is somewhat misplaced, because the instruction does not concern a vehicle following too closely behind another, and the  record

49

contains no facts that Hunter's vehicle suddenly darted in front of Preston's vehicle. We find that the instruction should not have included the term "absolute," however, the instruction did not rise to the level of reversible error.

### 8. Jury Instruction D-2

¶103. Next, Carla argues that the trial court erred by admitting instruction D-2, submitted as C-15. She claims that the instruction was peremptory, a misstatement of law, a misstatement of the facts, cumulative, compound, and placed an absolute duty on the plaintiff. This instruction stated, in part:

> [A] motorist has a duty to operate his vehicle at a reasonable rate of speed under the circumstances then confronting him. A motorist also has a duty to keep a reasonable lookout to the front of his vehicle in order to keep it under reasonable and easy control and to anticipate and expect the presence of other vehicles in front if him on the roadway. . . .

¶104. In *Church v. Massey*, 697 So. 2d 407, 412 (Miss. 1997), this Court upheld a jury instruction almost identical to jury instruction D-2, submitted at C-15. In *Massey*, the jury instruction stated:

> You are instructed that it was the duty of the Plaintiff, Gary W. Church to drive his motorcycle at a reasonable rate of speed under the circumstances then confronting him. It was also his duty to keep a reasonable lookout to the front and sides of his moving motorcycle to keep it under reasonable and easy control and anticipate and expect the presence of other vehicles which were also using 8th Street at the same time.

*Massey*, 697 So. 2d at 412. *See also Fielder v. Magnolia Beverage Co.*, 757 So. 2d 925, 935-36 (Miss. 1999). Carla correctly stated that *Massey* held that the failure to yield the right-of-way and failure to maintain proper lookout are two separate theories of liability. *Massey*, 697 So. 2d at 411. However, she also argues that the instruction that was given was compound.

50

Jury instruction D-2 was proper because it was similar to language this Court affirmed in *Massey*. In *Massey*, one of the issues was whether the trial court erred by refusing a "lookout" theory of negligence on the basis that it was adequately covered in another instruction, P-3. *Id*. This Court found that jury instruction P-3 addressed the failure to yield the right-of-way only, and not the failure to keep a reasonable lookout. *Id*. The Court reversed and remanded partly due to the trial court's refusal of a lookout instruction. *Id*. at 414-15. The instructions as given did not adequately instruct the jury on the theories of liability. *Id*. at 411.

¶105. The fact that jury instruction C-15 may be compound does not invalidate the instruction. Further, the instruction was not cumulative, as each of R&R's instructions covered different legal principles.[12] The instruction also does not place an "absolute" duty on the plaintiff; indeed the term "absolute" is not in the instruction. Also, the the jury could

---

[12] The instructions are summarized as follows:

| | |
|---|---|
| D-1 submitted as C-14: | motorist's obligation to see that which is in plain view, duty to be alert, and cannot assume a highway is clear. |
| D-2 submitted as C-15: | motorist's duty to operate his vehicle at a reasonable rate of speed, keep a reasonable lookout, keep it under reasonable and easy control, and expect the presence of other vehicle in front of him on the roadway. |
| D-3 submitted as C-16: | motorist's duty to drive his vehicle at a rate of speed not greater that the posted speed limit. |
| D-5 submitted as C-17: | if a motorist cannot stop his vehicle within the range of his vision, he is required to reduce his speed. |
| D-6 submitted as C-18: | visibility of the trailer to a driver keeping a proper lookout and from a distance in which the driver reasonably could have avoided running into it. |

have inferred that Preston did not operate his vehicle at a reasonable rate of speed given the circumstance, or failed to keep a reasonable lookout, or failed to keep his vehicle under reasonable and easy control, or failed to expect the presence of other vehicle in front of him based on the evidence. The jury could have inferred that Preston failed to operate the vehicle at a reasonable rate of speed under the circumstances confronting him on that night. Likewise, Trooper Shive testified that he could easily see the lights from the truck at a distance and the lights were "glowing." Richard stated that he could see the truck lights a mile down the road. In addition, the jury had numerous photographs of the truck at the scene of the accident depicting the lights on the back of the truck. The jury also heard testimony that the truck was white and that the collision occurred on an eight-tenths of a mile section of a flat, Delta roadway. Given the facts presented to the jury, the instruction was proper. This Court finds that the trial court did not err by giving jury instruction C-15, and this issue is without merit.

### 9. Jury Instruction D-3

¶106. Carla contends that the trial court erred by admitting jury instruction D-3, submitted as C-16. She argued that instruction imposed a strict-liability standard and a peremptory standard. This instruction referred to a motorist's duty to drive a vehicle within the speed limit. The instruction stated:

> You are instructed that under the law of this state a motorist has a duty to drive his vehicle at a rate of speed not greater that the posted speed limit. *If you find* that Preston Utz, at the time he confronted the trailer pulled by Anthony Q. Hunter, was traveling at a speed in excess of the posted speed limit of 65 miles per hour, *then* you must find that Preston Utz was negligent.

If you find that this negligence on the part of Preston Utz, if any, was the sole proximate cause of the accident, then it is your sworn obligation to return a verdict for the Defendants.

However, if you find that this negligence on the part of Preston Utz, if any, was a proximate contributing cause of the accident, then you must assign a percentage of fault to Preston Utz, as explained later in these instructions.

(Emphasis added.) The trial court determined that caselaw supported the instruction which essentially imposed negligence, not strict liability, if Preston had exceeded the speed limit and/or failed to keep a proper lookout and control of his vehicle. *See Fielder*, 757 So. 2d at 935-36 (Miss. 1999); Miss. Code Ann. § 63-3-501 (Rev. 2004). The instruction was not peremptory by instructing the jury that "you must find that Preston Utz was negligent" as Carla asserts in her argument. Instead the instruction provides that "*If you find* that Preston Utz . . . was traveling at a speed in excess of the posted speed limit of 65 miles per hour, *then* you must find that Preston Utz was negligent." (Emphasis added.) This conditional language does not compel the jury to find negligence on the part of Preston. The plain language also did not place the burden on Preston to avoid the accident regardless of whether R&R and Hunter were at fault, as argued by Carla. Additionally, there is no peremptory language that requires that "you must assign a percentage of fault to Preston Utz." When the instruction was read in context, the conditional language plainly stated that "*if* you find that his negligence on the part of Preston Utz, *if any*, was a *proximate contributing cause* of the accident, then you must assign a percentage of fault to Preston Utz, as explained later in these instructions." Further, the language required that a percentage of fault be assessed only if Preston's negligence was a "proximate contributing cause" and did not require the jury to

53

relieve R&R and Hunter of an assessment of fault unless the rate of speed was the sole proximate cause of the accident. Accordingly this issue is without merit.

### 10. Jury Instruction D-5

¶107. Next, Carla argues that the trial court erred by admitting D-5, submitted as C-17. This instruction concerned a motorist's ability to travel or reduce his speed to stop his vehicle within his range of vision. Carla contends that this instruction was erroneous because it stated in part "If you find from a preponderance of the evidence that under the circumstances existing on December 14, 2003, Preston Utz could not see in front of him at a distance within which he could reduce his speed and bring his vehicle to a speed in which he could stop within his range of vision. . ." Carla argues that it was a misstatement of law and facts, and that the trial court limited testimony and prohibited statements about what was visible to Preston Utz.

¶108. This Court has upheld similar language in other cases. *See **Choctaw Maid**, 822 So. 2d at 920.*[13] Further, the evidence showed that the lights of the tractor-trailer were visible

---

[13] The jury instruction in ***Choctaw Maid*** stated:

You are instructed that under the law of the State of Mississippi that when a driver's vision is reduced or blinded to the extent that he cannot see in front of him at a distance within which he can stop his car at the rate of speed he is traveling, he is required to reduce speed and bring his car within such speed so that he can stop within the range of his vision.

Under the circumstances existing on July 18, 1996, if you believe that Thomas Hailey's vision was reduced or blinded to the extent that he could not see in front of him at a distance within which he could reduce his speed and stop his vehicle, then he had a duty to reduce his speed and bring his vehicle to a speed in which he could stop his vehicle within his range of vision. If he failed in this duty, then he was negligent. If you believe that this negligence, if any,

54

from a far distance. The roadway on that portion of Highway 61 was flat and clear. Based on the impact of the crash, Bentley opined that Preston may have been traveling as much as eighty-five miles per hour. In addition, there was no indication of any gouge or skid marks on the road, indicating little if any maneuvering by Preston to avoid the collision. The trial court did not err by giving this instruction.

### 11. Jury Instruction D-6

¶109. Carla next contends that the trial court erred by giving jury instruction D-6, submitted as C-18. This instruction stated in part:

> If you find from a preponderance of the evidence that the trailer pulled by Anthony Q. Hunter would have been visible to a driver keeping a proper lookout for vehicles in the roadway from a distance in which that driver reasonably could have avoided running into it, then it is your sworn duty to find that Preston Utz was negligent.

This instruction follows Mississippi law. *See **Choctaw Maid**,* 822 So. 2d at 919 (citing ***Butler v. Chrestman***, 264 So. 2d 812, 815 (Miss. 1972)) ("The general rule is well established that it is negligence for a motorist to operate an automobile on a highway at such speed that it cannot be stopped within the range of the driver's vision."); ***Bolden***, 606 So. 2d at 111 ("[t]he driver of a car is charged with the duty of keeping a proper lookout and being on alert for vehicles, objects and persons ahead in the highway" and "duty of seeing what he should have seen" and duty "to have his car under proper control, to be on the alert on the highway, and avoid striking plain objects").

---

     contributed to the accident, then you shall assign a percentage of fault to him.

*Choctaw Maid*, 822 So. 2d at 920.

¶110. Again, the evidence was that the lights of the tractor-trailer were visible from a distance, the roadway was straight at the area of impact, and therefore, there was more than enough time to change lanes. The trial court did not err by giving this instruction.

### 12. Jury Instruction C-19 (special interrogatory)

¶111. Carla contends that the trial court erred by giving jury instruction C-19, which was a special interrogatory verdict form. She contends that the instruction finds that R&R and Hunter were negligent for violating the FMCSRs only to require the jury to find that the failure was the proximate cause. She contends that this standard is impossible because the trial court refused to allow evidence that the violations were the cause of Preston's death.

¶112. The special interrogatory is within the trial court's discretion pursuant to Mississippi Rule of Civil Procedure 49. *See also* ***Missala Marine Servs., Inc. v. Odom***, 861 So. 2d 290, 296 (Miss. 2003) (citing ***W.J. Runyon & Son, Inc. v. Davis***, 605 So. 2d 38, 49 (Miss. 1992), overruled on other grounds) ("the decision to instruct the jury by means of a special verdict or a general verdict with interrogatories is within the discretion of the trial court and will be overturned only on a showing that the lower court abused its discretion").

¶113. Jury instruction C-19 stated in part:

> In returning your verdict consistent with the instructions of law given to you by this Court, you should answer the following questions, each answer being based upon a preponderance of the evidence and agreed to you by nine or members (sic) of the Jury.
>
> **QUESTION NO. 1:** The Court has instructed you that the Defendants, Running &Rolling Trucking, Inc., and Anthony Q. Hunter were negligent in failing to comply with the requirements of the Federal Motor Carrier Safety Regulations. Do you find that that such negligence was a proximate cause and/or proximate contributing cause of the death of the deceased Preston Jimmy Utz?

56

CHECK ANSWER: _____ Yes              _____No

If you answer "No" to Question 1, please advise the Bailiff that you have reached a verdict.

If you answer "yes" to the above question, please answer QUESTION 2.

The jury answered "No" to the question. Carla's argument that the instruction was incorrect, a misstatement of law, and misleading to the jury is without merit.

¶114. This Court previously addressed the issue of negligence. Even though negligence was established by R&R and Hunter for failure to comply with the FMCSRs, Mississippi law still required that the negligence was the proximate cause and/or proximate contributing cause of the injury, Preston's death, in order to recover. *Thomas*, 667 So. 2d at 596-97 (citing *Bryant v. Alpha Entm't Corp.*, 508 So. 2d 1094, 1096 (Miss. 1987)). This portion of the instruction is also in keeping with jury instructions C-4 on the definition of negligence, C-10 on proximate cause, and very closely mirrors C-13 on R&R's and hunter's negligence in failing to comply with the FMCSRs and whether that failure was the proximate and/or proximate contributing cause of Preston's death. As for Carla's assertion that it is impossible to show the standard that the negligence on the part of R&R and Hunter proximately caused the injury because the trial court refused to allow evidence that the violations were the cause of Preston's death, these concerns otherwise have been addressed in previous issues and are without merit.

### 13. Jury Instructions D-1, D-2, D-3, D-5, and D-6

¶115. Carla claims that the trial court erred by giving jury instructions D-1, D-2, D-3, D-5, and D-6. She contends that the instructions were cumulative and when read as a whole,

57

placed a duty on Preston to see the trailer and avoid the accident which was peremptory, imposed a strict-liability standard, and were a misstatement of the law and facts.

¶116. This Court finds that the trial court did not err by giving these instructions for reasons already expressed in previous issues before this Court.

## CONCLUSION

¶117. For the above reasons, the judgment of the Circuit Court of Bolivar County, Second Judicial District is affirmed.

¶118. **AFFIRMED.**

**CARLSON AND GRAVES, P.JJ., RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR. WALLER, C.J., AND DICKINSON, J., NOT PARTICIPATING.**